THE DETROIT EDISON COMPANY v PUBLIC SERVICE
COMMISSION

ATTORNEY GENERAL v PUBLIC SERVICE COMMISSION

Docket Nos. 61294, 61295. Argued June 5, 1979 (Calendar No. 4).—
Decided December 23, 1982. Rehearing denied 417 Mich 1133.

The Public Service Commission authorized The Detroit Edison
Company to include a fuel adjustment clause in its rates for
domestic electric service. The adjustment was to be billed
during the second month following the calendar month in
which Edison burned the fuel. The commission later modified
Edison's accounting procedures to treat the deferred fuel ex-
pense as an asset to be carried forward. The commission then
ordered that the lag between use and billing be eliminated,
determined that Edison's actual fuel costs exceeded the amount
it could recover under the fuel adjustment clause, and ordered
Edison to write off that amount against net income over a ten-
year period. Edison and the Attorney General brought actions
in the Ingham Circuit Court seeking review of the order. The
circuit court, James T. Kallman, J., vacated the order of the
commission and remanded the cases to the commission with
directions to enter an order allowing collection of the excess
amount over a 12-month period by means of a surcharge. The
Court of Appeals, V. J. Brennan, P.J., and D. E. Holbrook and
R. B. Martin, JJ., reversed the judgment of the circuit court,
affirmed the order of the commission, and directed the circuit
court to remand the case to the commission (Docket Nos. 30365,
30366). Edison appeals.

The judgment of the Court of Appeals is affirmed by an
equally divided Court.

Chief Justice Fitzgerald, joined by Justices Williams and
Ryan, would affirm the judgment of the Court of Appeals
because the fuel adjustment clause was designed to impose an
adjustment which was an estimate based on prior costs of fuel
costs in the billing month and, as used by Edison, did not result

REFERENCES FOR POINTS IN HEADNOTES
[1-6] 64 Am Jur 2d, Public Utilities § 138 et seq.
[2-6] 64 Am Jur 2d, Public Utilities § 240 et seq.

in any gap in the collection of fuel costs. Edison is entitled only to the adjustment authorized by the commission, not to a dollar-for-dollar recovery of excess fuel costs.

1. The authorized fuel adjustment was based on the amount of electricity consumed in a billing month, not on electricity consumed during the earlier month which provided the fuel cost factor. Had the adjustment been intended to produce a dollar-for-dollar recovery of excess fuel costs, the factor would have been based on the actual fuel costs during the billing month. Consequently, application of the factor would not necessarily provide an exact match of excess fuel costs and billings under the fuel cost adjustment clause. The fact that customers leaving Edison were not assessed an additional charge for the excess fuel costs in their final two months of service and new customers were not excused from paying the adjustment charge during their first two months of service demonstrates that the adjustment charge was based on estimated rather than actual fuel costs. The clearest evidence that the fuel adjustment clause was not designed to recover past costs is the fact that the clause was applied in the month following its inception, with no billing being deferred.

2. Under the clause, Edison's total adjustment charges amounted to less than its excess fuel costs. However, that is simply one of the risks of operating a utility under a regulatory system. Rates are set on the basis of estimated costs. The fuel adjustment clause was a device to improve those estimates. The statute which provided for the fuel adjustment clause merely authorized the Public Service Commission to permit a utility to include an adjustment in its rate structure; it did not create a right in the utility to have a particular kind of clause. Edison was entitled only to the clause approved by the commission. That clause provided a specific method of calculating adjustments on the basis of excess fuel costs of prior months. Edison used the formula to collect the amounts to which it was entitled.

Justice Levin, joined by Justices Kavanagh and Coleman, would reverse the judgment of the Court of Appeals because Edison was entitled to recover ultimately the costs incurred during the two-month lag between use and billing which had been carried forward, for which no provision for collection had been made.

1. Once the commission authorized the fuel adjustment clause and later decided to eliminate the billing lag, Edison was entitled to collect the costs incurred during the lag at some time. The accounting procedures authorized by the commission

to permit Edison to carry forward the excess fuel costs simply recognized that Edison spent more for fuel during the period in question than it had collected under the fuel adjustment clause. Edison never recovered those costs. Upon revising the clause, the commission stated that the clause was intended to recover all increases in fuel costs beyond Edison's control on a timely basis.

2. There is no reason to conclude that Edison waived its right to seek and collect the excess fuel costs because it accepted the two-month lag in collection at the time the clause was approved. There is nothing in any of the commission's orders warranting the conclusion that the commission had decided that Edison would never be able to collect the excess fuel costs until the commission ordered that the amount be written off. Edison then expeditiously sought redress in the circuit court. It was beyond the power of the commission to require Edison to write off expenses actually incurred.

Justice Levin wrote separately in answer to the opinion for affirmance to note that while the commission was authorized to design the fuel adjustment clause, Edison was not required to acquiesce in the commission's design. It was not until the commission, ignoring the reason for providing rate adjustments and prior indications to the contrary, characterized the clause as a fixed rate and ordered the write-off, that Edison knew it would not be permitted to recover the costs incurred during the two-month lag. When the clause was approved, there was no prospect of fuel costs being lower than predicted. The effect of characterizing the clause as a fixed rate would be to insure that Edison would never recover the excess costs. The commission could not, consistent with the purpose of a fuel adjustment clause, design a clause which was bound to fail to provide recovery of excess fuel costs. Edison acted in a timely manner in seeking relief from the commission's order.

82 Mich App 59; 266 NW2d 665 (1978) affirmed.

OPINION BY FITZGERALD, C.J.

1. PUBLIC UTILITIES — RATES — FUEL ADJUSTMENT CLAUSES.

*A fuel adjustment clause authorized by the Public Service Commission for inclusion in a public utility's domestic rates which authorized an adjustment of the amount billed to a customer for the energy used in the billing month based on the actual amount of energy consumed in that month, but using excess fuel costs of prior months, should not be construed to have intended a dollar-for-dollar recovery of excess fuel costs; rather,*

*the adjustment was designed to improve the estimate of costs
on which the rates were based.*

2. PUBLIC UTILITIES — RATES — FUEL ADJUSTMENT CLAUSES.

*The statute allowing a public utility to include a fuel adjustment
clause in its rates did not create a right to a particular kind of
clause, but only a clause which is approved by the Public
Service Commission (MCL 460.6a; MSA 22.13[6a]).*

DISSENTING OPINION BY LEVIN, J.

3. PUBLIC UTILITIES — RATES — FUEL ADJUSTMENT CLAUSES.

*A fuel adjustment clause authorized by the Public Service Com-
mission for inclusion in a public utility's domestic rate struc-
ture to recover all increases in fuel costs beyond the utility's
control which permitted calculation of the adjustment in a
billing month on the basis of the actual fuel costs of a previous
month should be construed to authorize the ultimate recovery
of all costs incurred, including those costs incurred during the
lag between the actual use of the fuel and billing.*

4. PUBLIC UTILITIES — RATES — RETROACTIVE RATEMAKING.

*The rule against retroactive ratemaking precludes the Public
Service Commission from increasing or reducing rates retroac-
tively, but manifestly does not preclude it from acting on the
basis of facts that occurred before the order was entered; the
rule does not require that an application for an increase in
rates be filed before the incurrence of the expense which is said
to justify the increased rates.*

5. PUBLIC UTILITIES — PUBLIC SERVICE COMMISSION — POWERS.

*The Public Service Commission does not have the power, in
changing the method of calculating a fuel adjustment charge,
to order a public utility to write off expenses actually incurred
as a result of increased fuel costs but not yet recovered under
the former method of calculation.*

SEPARATE OPINION BY LEVIN, J.

6. PUBLIC UTILITIES — RATES — FUEL ADJUSTMENT CLAUSES.

*A public utility is not required to acquiesce in whatever fuel
adjustment clause is designed by the Public Service Commis-
sion, and the commission cannot, consistently with the purpose
of fuel adjustment clauses, design a clause which is bound to
fail to provide recovery of the utility's excess fuel costs.*

*Foster, Swift, Collins & Coey, P.C. (by Theodore*

*W. Swift* and *David W. McKeague),* and *Leon S. Cohan* for The Detroit Edison Company.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Arthur E. D'Hondt* and *James E. Riley,* Assistants Attorney General, for the Public Service Commission.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Hugh B. Anderson* and *Roderick S. Coy,* Assistants Attorney General, for the Attorney General.

*Conner, Harbour & Dew* (by *P. D. Connor)* and *James D. Irvine* for intervening defendant Ford Motor Company.

Fitzgerald, C.J. *(for affirmance).* In our order granting leave to appeal, we stated as the first issue whether "the charge allowed by the fuel cost adjustment clause [is] a charge to recover past costs, or a charge based on past experience reflected in a current charge".[1] The answer to this question is decisive in resolving all of the issues presented in this case.

The cornerstone of the position taken by Edison, and accepted by the opinion for reversal, is that the FCAC adopted in February 1974 was intended to impose a fuel adjustment in the billing month to recover fuel costs incurred two months before. If that is the way the clause operated, then the December 1974 and January 1975 fuel costs had not yet been billed when the MPSC changed the FCAC in February 1975.

On the other hand, if, as the MPSC maintains, the FCAC was designed to impose a fuel adjustment in the billing month as an estimate of fuel

---

[1] 403 Mich 853 (1978).

costs based on prior experience, then Edison did not suffer any gap in collection of fuel costs in the months in question because the December 1974 and January 1975 billings included the fuel costs for those months.

We think it is clear that the February 1974 FCAC used prior costs as an estimate of current costs, and would affirm.

.I

Three features of the FCAC demonstrate that it was not designed to recover all past costs, but was intended only to estimate current costs on the basis of past experience.

First, the FCAC based its adjustment on the consumption of electricity in the billing month, not on consumption in the prior month whose fuel costs were used. If the superseded FCAC was intended to produce a dollar-for-dollar recovery of excess fuel costs, it would have applied the adjustment factor on the basis of actual fuel costs in a given month to the amount of energy used by a customer in that month. However, the superseded FCAC applied the adjustment factor to the amount of energy used in the billing month, which was one or two months after the month in which the fuel was used. Consequently, there never would be an exact match of excess fuel costs and FCAC billings unless energy use in the cost month was the same as energy use in the billing month. Any variation would lead to a corresponding over- or undercollection of fuel expenses. Similarly, individual Edison customers were never billed the actual cost of the energy they had used; rather, they were billed an amount based on a formula using an earlier month's costs and current month's usage.

A second feature of the FCAC that demonstrates that it was a charge for estimated fuel costs in the billing month is that customers leaving Edison were not assessed an additional charge for the excess fuel costs in their last two months of service, nor were new customers excused from paying the adjustment charge for their first two months of service. If, as Edison and the opinion for reversal contend, the superseded FCAC was in fact a charge to recover past costs, customers leaving Edison would avoid paying for fuel they used and new customers would be forced to pay for fuel charges incurred before they received service.

Finally, perhaps the clearest evidence that the FCAC was not designed to recover past costs is the fact that the superseded FCAC was applied in the month following its inception. The fuel clause became effective February 4, 1974, and Edison first applied it to residential customers in its March 1974 bills.[2] Under the fuel clause formula, the adjustment was based on January 1974 costs. Using the analysis of the opinion for reversal and Edison, the March bill was a deferred charge for January's costs. However, Edison had already collected all it was entitled to for January under its pre-FCAC rate structure. Thus, application of the February 1974 FCAC to collect for costs incurred in January 1974 would have meant that Edison was collecting more for January than was authorized under the rate structure in effect in January, the clearest possible kind of prohibited retroactive ratemaking.[3] Only if the billings in March 1974

[2] The FCAC could not affect February 1974 billings because the second preceding month would have been December 1973, the base month for the FCAC, as to which, by definition, there could be no excess fuel costs.

[3] *Michigan Bell Telephone Co v Public Service Comm*, 315 Mich 533; 24 NW2d 200 (1946).

were meant to charge for March fuel costs, estimated with the actual January data, could the FCAC be permissible prospective ratemaking.

The opinion for reversal says that with the change in the FCAC in February 1975, "Edison was entitled to collect *at some time* for December and January as such." As the foregoing analysis of the FCAC demonstrates, Edison did collect for December 1974 and January 1975—in its December 1974 and January 1975 billings. There was no gap in Edison's billing of fuel costs recoverable under its FCAC.[4]

## II

Litigation over whether fuel adjustment clauses are deferred or current charges has been fairly common in federal courts. Indeed, those courts have developed a standard terminology for characterizing the two kinds of systems, referring to a fuel clause that recovers all past costs as a "cost of service" tariff, and to a clause that uses past costs to estimate current ones as a "fixed rate" tariff.[5]

[4] As noted in the opinion for reversal, we remanded to the MPSC for the taking of evidence and the making of findings regarding the fuel adjustment clauses used between February and May, 1975.

On remand, the MPSC found that the modifications in FCAC adopted in the February 1975 order were put into effect in billings for February 1975, except that the lag-adjustment feature was not used immediately. For customers being billed on the two-month lag system, the lag-adjustment procedure went into effect in April. For those being billed on a one-month lag system, the lag adjustment was first applied in March 1975. Thus, even using Edison's theory regarding the operation of the FCAC, the failure to apply the lag adjustment in February and March means that the 1974 FCAC was still effectively in operation in December 1974 and January 1975, resulting in the recovery of Edison's excess fuel costs for those months.

[5] *Maine Public Service Co v Federal Energy Regulatory Comm,* 622 F2d 23, 25 (CA 1, 1980); *Boston Edison Co v Federal Energy Regulatory Comm,* 611 F2d 8, 9 (CA 1, 1979); *Public Service Co of New Hampshire v Federal Energy Regulatory Comm,* 195 US App DC 130, 134; 600 F2d 944, 948 (1979).

We find several cases from the United States Courts of Appeals dealing with very similar facts persuasive authority for finding the superseded Edison FCAC to have been a fixed-rate tariff, designed to estimate current costs on the basis of past experience.

*Boston Edison Co v Federal Energy Regulatory Comm,* 611 F2d 8 (CA 1, 1979), is a case factually very similar to the instant case. Boston Edison appealed an order of the Federal Energy Regulatory Commission that had struck down a surcharge to cover fuel cost expenses allegedly left unrecovered when Edison converted from a two-month lag billing formula to a current month formula. The First Circuit noted that under the former fuel clause, fuel costs from one month were applied to energy use in the second succeeding month. Thus, the old clause was not designed to achieve dollar-for-dollar recovery as would a true cost of service tariff. The Court also noted that Edison failed to assess additional charges on customers leaving the system as would be expected under a true deferred billing system. The Court therefore concluded that the fuel clause was a fixed-rate tariff and, therefore, no surcharge could be allowed. Both of the reasons underlying the First Circuit's decision are present in the instant case.

In *Public Service Co of New Hampshire v Federal Energy Regulatory Comm,* 195 US App DC 130; 600 F2d 944 (1979), *cert den* 444 US 990; 100 S Ct 520; 62 L Ed 2d 419 (1979), four electric companies sought review of the commission's orders refusing to allow surcharges to compensate for alleged uncompensated fuel costs to which the companies claimed to have become entitled when

they switched from fuel clauses based on fuel costs in the billing month rather than for some prior period. Two of the companies had fuel clauses based on fuel costs from two months preceding the billing month, which coincides with the system used in the fuel clauses in the instant case. As did Edison in the present case, the companies began billing under the superseded clauses immediately after they became effective.

The District of Columbia Circuit held that the fuel clauses were fixed-rate tariffs primarily on the basis of two facts. The first was that the formulas mismatched the costs from an earlier month with the power consumption in the billing month.

"Thus, the fuel adjustment charge that was used was *not* based on the cost of fuel that had been used to generate the power for which users were billed. Since customer usage varies from month to month, this mismatch—applying a fuel adjustment factor based on one month to kilowatt-hours used during another month—would not lead to exact recovery of actual fuel expenses. Thus, the superseded clauses did not simply defer recovery of the cost of fuel. The clauses brought about a charge that differed from actual cost. This result is inconsistent with petitioners' claim that the clauses were cost of service tariffs with deferred billing. But the result squares with the Commission's view that the clauses were fixed rate tariffs which used fuel costs in a prior period as a proxy for actual current costs." (Emphasis in original; footnote omitted.) 195 US App DC 138-139; 600 F2d 952-953.

Second, the Court said that the companies' billing was not actually deferred because they began billing immediately after the clauses became effective, rather than waiting until the "billing lag" had elapsed.

The District of Columbia Circuit concluded that

the fuel clauses were fixed-rate tariffs and, accordingly, the refusal to impose surcharges was proper. Again, the reasons supporting the Court's decision apply with equal force to the facts of the case before us.

In two other cases, *Virginia Electric & Power Co v Federal Energy Regulatory Comm,* 580 F2d 710 (CA 4, 1978), and *Jersey Central Power & Light Co v Federal Energy Regulatory Comm,* 589 F2d 142 (CA 3, 1978), the federal courts were again presented with alleged unbilled fuel expense resulting from a superseded fuel clause. The principal issue was whether the old clause was designed to collect actual expenses on a deferred basis or to collect an approximation of current costs based on past experience. Each Court held that the superseded fuel clause before them fell within the latter category.

Both Courts noted that new customers began paying the adjustment immediately and that customers leaving the system were not billed for deferred charges. In addition, the Fourth Circuit pointed out that the company billed adjustments in the first month the fuel clause became effective and that these initial adjustments could not legally have represented charges for past service.

The FCAC in the Third Circuit case, like Edison's, required the adjustment factor to be applied to energy used during the billing month. The Court noted that this was inconsistent with the utility's contention that the charge was a pass-on of actual past costs incurred. In order to achieve that result, the Court said that the billing should have been computed on the basis of energy use in the month in which the fuel expenses were actually incurred.

The Third Circuit Court of Appeals also thought it significant that the FCAC used a formula, as

this was inconsistent with the utility's argument that an assessment of actual cost was intended. Nor did the fact that the formula was based on costs of a past period, the Court said, prevent it from being used as the basis for a current charge.

"The fact that the formula was based on costs in a preceding period did not change its effect of providing a method to calculate a current charge rather than to exact a precise recovery of past expenses. Such a formula could as well have been based, for example, on some past wholesale price index or similar factor rather than actual cost incurred, and yet be the basis for a 'current' charge." 589 F2d 145.

All of the factors which led to the Courts' decisions in these two cases are present here. As explained more fully above, Edison's new customers began paying immediately and customers leaving the. system were not billed for deferred charges; Edison billed adjustments in the month after the fuel clause became effective; Edison's superseded FCAC required the adjustment factor to be applied to energy used during the billing month rather than the fuel cost incurrence month; and, Edison's superseded FCAC used a formula based on costs of a past period.[6]

[6] Edison relies upon *Maine Public Service Co v Federal Power Comm*, 579 F2d 659 (CA 1, 1978), which it claims "seriously challenges" the cases relied upon by appellees. In that case, the First Circuit held that the Federal Power Commission had erred in regarding itself as automatically precluded by the "filed rate doctrine" from approving a surcharge because the First Circuit found the "filed rate doctrine" was not applicable. Under the "filed rate doctrine" a public utility "can claim no rate as a legal right that is other than the filed rate, whether fixed or merely accepted by the Commission." *Montana-Dakota Utilities Co v Northwestern Public Service Co*, 341 US 246, 251; 71 S Ct 692; 95 L Ed 912 (1951).

The Court remanded the case to the commission for reconsideration, stating that the commission was not precluded from rejecting the surcharge, but that it was error for the commission to have rejected the surcharge on the grounds that its hands were tied by the

### III

We think the concern that Edison has not been able to recover all of its costs misses the point. Certainly it is true that in this case Edison's total FCAC charges were less than its excess fuel costs. However, that is simply one of the risks that any utility operating under our regulatory system takes.[7] Rates are set on the basis of estimates of costs, typically based on a "test year" or other period,[8] which is sometimes adjusted on the basis

"filed rate doctrine". Obviously, there is no problem with the "filed rate doctrine" in the instant case. The narrow ground upon which the *Maine* case turns is sufficient in itself to distinguish it from the case at bar.

Yet, Edison seizes upon other language in the opinion which it claims, *inter alia,* requires the conclusion that surcharges do not necessarily constitute retroactive ratemaking and that courts reviewing surcharges must "inquire into the equities", considering the reasonable expectations of customers and the legitimate needs of the utility.

The language upon which Edison relies has been seriously undermined by later cases. On remand, the commission concluded that the FCAC was a fixed-rate tariff and, therefore, the surcharge was disallowed. The decision was appealed to the First Circuit, which denied the petition for review. *Maine Public Service Co v Federal Energy Regulatory Comm,* 622 F2d 23 (CA 1, 1980).

In a later First Circuit case, *Boston Edison Co v Federal Energy Regulatory Comm, supra,* the Court also disallowed a surcharge, holding that a fixed-rate tariff was involved. Significantly, the author of the original *Maine Public Service* decision, speaking for himself, stated that *Maine Public Service* must be read in light of the presentation the commission made at the time. The commission chose to rest mainly on the "filed rate doctrine", and the *Maine Public Service* Court did not feel that the commission had analyzed sufficiently the nature of the superseded fuel clause which determined the question of retroactive ratemaking.

Thus, it is clear that the First Circuit has held that it will disallow a surcharge where a fixed-rate tariff is involved. This is similar to the other federal decisions considered. In addition, in *Public Service Co of New Hampshire v Federal Energy Regulatory Comm, supra,* the District of Columbia Circuit thoroughly analyzed the language in *Maine Public Service* relied upon by Edison and was extremely critical of it.

[7] Of course, the utility faces a corresponding "risk" of overcollection should costs fall. Cf. *Michigan Bell Telephone Co v Public Service Comm, supra.*

[8] See, *e.g., Attorney General v Public Service Comm,* 63 Mich App 69; 234 NW2d 407 (1975).

of predictions as to future trends and events that
will affect costs.[9] In the case of Edison's February
1974 rates, the FCAC provided a further device for
improving the estimates on which the billings
were based. But the essential principle of the rule
against retroactive ratemaking is that when the
estimates prove inaccurate and costs are higher or
lower than predicted, the previously set rates can-
not be changed to correct for the error; the only
step that the MPSC can take is to prospectively
revise rates in an effort to set more appropriate
ones.[10] The MPSC's adoption of the lag-adjustment
factor in February 1975 was simply one more
effort to better estimate current costs in future
billings.[11]

---

[9] See, e.g., General Telephone Co of Michigan v Public Service
Comm, 78 Mich App 528; 260 NW2d 874 (1977).

[10] See generally General Telephone Co of Michigan v Public Service
Comm, 341 Mich 620, 632; 67 NW2d 882 (1954:

"This Court made it very clear in Michigan Bell Telephone Co v
Public Service Comm, 315 Mich 533 (66 PUR NS 287), that the
commission cannot establish a retroactive rate thereby correcting
injustice caused by delay in establishing rates for the past. When
failure to provide adequate rates in the past cannot be remedied by
retroactive orders, it follows that every reasonable effort should be
made by the commission to eliminate unnecessary delay and to pass
judgment on facts that will not only reflect upon the present but a
reasonable period in the future."

[11] We also disagree with Edison's claim that the deferred fuel cost
accounting procedure approved on July 29, 1974, implies that excess
fuel costs incurred but not yet "reflected" in customers' bills were to
be recovered in later months.

First, the accounting change was authorized almost six months
after the superseded FCAC was adopted. Thus, it cannot serve as an
indication of Edison's or the commission's intent regarding the nature
of the superseded FCAC at the time it was instituted. One of the
acknowledged purposes of the accounting change was to enable Edi-
son to have a more favorable financial position to assist in sales of its
securities. This, we suggest, is the primary implication of Edison's
request for and the commission's approval of the accounting change.

Edison also argues that use of the deferred accounting method
would have violated accounting principles and misled investors unless
there was a reasonable assurance of recovery; hence, the commission
would not have approved the accounting change unless it believed

.The applicable statute[12] did not create a right of the utility to have any particular kind of fuel adjustment clause; it merely authorized the MPSC to use such clauses. Thus, Edison is entitled to whatever the MPSC-approved FCAC provided. Analysis of the operation of the FCAC in question and examination of the most relevant authorities compels the conclusion that Edison's February 1974 FCAC did not entitle it to a dollar-for-dollar recovery of excess fuel costs. It provided a specific method of calculating adjustments based on excess fuel costs in prior months. Edison has used the formula to collect the appropriate amounts, and it is entitled to no more.

The Court of Appeals judgment should be affirmed.

WILLIAMS and RYAN, JJ., concurred with FITZGERALD, C.J.

LEVIN, J. *(for reversal).* On February 4, 1974, the Michigan Public Service Commission authorized

that the superseded FCAC was a recovery mechanism. This contention fails for two reasons. First, in the order approving the accounting change, the commission specifically ordered the change to be properly disclosed in Edison's financial statements. Second, in its original application for the deferred accounting method, realizing that a balance might be left in such an account if the FCAC was changed to make it more current, Edison included a paragraph which would have allowed charging customers for this balance. This paragraph was deleted by stipulation and replaced with a paragraph in which Edison agreed that the new accounting method would not result in higher rates for its customers. Thus, neither Edison nor its investors was misled to believe that the accounting change assured recovery of any balance created by its use.

Finally, we note that other courts have likewise rejected the argument that implementation of deferred fuel accounting implies recovery of excess fuel costs in later months. *Boston Edison Co v Federal Energy Regulatory Comm, supra,* p 10; *Public Service Co of New Hampshire v Federal Energy Regulatory Comm, supra,* pp 136-137; *State of North Carolina ex rel Utilities Comm v Attorney General,* 291 NC 451, 472-474; 232 SE2d 184, 197 (1977).

[12] Former MCL 460.6a; MSA 22.13(6a).

the Detroit Edison Company to include in its rate structure a fuel adjustment clause for domestic service;[1] the order provided that "[t]he adjustment shall apply to the second billing month following the calendar month in which the fuel is burned".[2]

On July 29, 1974, the commission entered an order authorizing and directing Edison to adopt revised accounting procedures so that costs or credits subject to later billing are "deferred" until reflected in billing adjustments without increase in rate base or cost of service for ratemaking purposes and with proper disclosure in the financial statements of the company.[3] This meant that Edi-

---

[1] For a number of years fuel cost adjustment clauses had been included in rates charged by Edison to industrial and commercial customers. The statute (MCL 460.6a; MSA 22.13[6a]) was amended in 1972, and thereafter such clauses could be provided for domestic service.

The Legislature has recently amended this statute again to preclude fuel adjustment clauses. 1982 PA 304. In addition, the adoption of Proposals D and H at the 1982 general election will affect utility practices in this area.

[2] On September 20, 1973, Detroit Edison applied to the commission for authority to include a fuel adjustment clause in its domestic (residential) rate schedules. (Case No. U-4426.) On February 4, 1974, the commission granted Edison's request to add a fuel adjustment clause to the rates for its domestic customers. The billing rule approved by the commission allowed Edison to increase or decrease the charges per kilowatt-hour by the amount that costs for fuel had increased or decreased from the cost in a base month (December 1973). The approved billing rule said that "[t]he adjustment shall apply to the second billing month following the calendar month in which the fuel is burned."

Thus, beginning in February 1974, Edison customers' electric bills consisted of two components: a base rate, and a fuel cost adjustment based on the fuel costs incurred two months before. For example, the September 1974 fuel costs (adjusted by a "line loss factor") exceeded the December 1973 base costs by $0.53517 per kilowatt-hour adjustment.

The fuel adjustment clause for certain commercial and industrial customers operated somewhat differently. Fuel costs were billed to those customers in the next billing month following the month in which the fuel was burned.

[3] Edison's accounting procedures called for fuel costs to be recorded as expenses in the month when the fuel was used. Under the fuel adjustment clause approved in February 1974 billings to customers

son could set up on its balance sheet as an asset the "deferred" fuel expense to be collected two months hence.

On February 3, 1975, the commission granted Edison a rate increase, and, at the same time, on its own initiative, decided that the billing lag should be eliminated because the fuel cost adjustment clause did not "in fact achieve the goal of fully recognizing the changes in fuel costs in a timely manner. Therefore the commission finds it necessary to correct the operation of the clause to reduce the existing time lag between the incurring and the reflecting of increased or decreased costs of fuel in the fuel adjustment. This lag has become a significant problem with rapidly escalating cost of fuels and with the potential assessment of proposed new taxes on these fuels."

The February 3 order went on to state that the commission was revising "the procedure used in determining the appropriate billing month adjustment factor so as to effectively eliminate the lag. This should be accomplished using actual figures as the basis for calculation of the adjustment factor."[4]

did not immediately reflect cost changes, creating a lag in recovery of fuel costs, which were rapidly increasing during this period. Citing this billing lag, on June 18, 1974, Edison petitioned the commission for approval of a change in the accounting procedure. (Case No. F-647.)

On July 29, 1974, the commission approved the request for the accounting change. The commission authorized Edison to record fuel costs above the base as an asset on the company's balance sheet. The accounting procedures treated these "deferred fuel costs" as being recovered when customers' bills were adjusted on the basis of these excess fuel costs two months later. The change in accounting procedures was made retroactive to January 1974.

[4] The February 3, 1975 order was issued in connection with a pending Edison rate increase application. (Case No. U-4570.) The order revised Edison's fuel cost billing rule. The order added a "lag adjustment" provision. Under the new rule, bills for a particular month would be adjusted on the basis of the second previous month's excess fuel cost *plus* the difference between the second and the fourth

The February 3 order also provided that the elimination of the lag "removes the need" for Edison to account for deferred fuel costs as directed in July, 1974, and, therefore, Edison "should file an application with the commission for a determination in a separate proceeding as to disposition of the accumulated fuel cost deferral up to the effective date of this order."

On December 22, 1975, the commission entered an order finding that Edison's actual fuel costs in December 1974 and January 1975 exceeded the amount it could recover under the fuel cost adjustment clause by $26,349,806. The commission observed that Edison had not asserted that it is entitled to recover the $26,349,806 *"because* of the accounting treatment" (emphasis in original) authorized in July 1974, but asserted rather that the accounting entries resulting from that order "simply serve as the device for measuring the amount of fuel costs actually incurred which were not collected by [Edison] from its customers prior to February 3, 1975". The commission concluded that it was "inherent in [Edison's] previous fuel clause that the full amount of fuel expenses would not be collected if fuel costs rose above the base fuel cost without at some subsequent time falling below the base cost. The only effect of Case No. F-647 [decided by the order dated July 29, 1974] was to display the undercollection separately in Account 174."

---

preceding months' excess fuel cost. Assuming a steady increase in fuel prices over the relevant period, this formula would lead current fuel cost adjustment billings to quite closely reflect actual current fuel prices.

The new schedule read much the same as the first; *i.e.,* "[t]he fuel adjustment shall be applied to the second billing month following the calendar month in which the fuel is burned", but to correct for the two-month lag, there was to be an increase or decrease "by the difference between the 'two-month lag' adjustment factor applied in the second immediately preceding billing month and the 'two-month lag' adjustment factor to be applied for the immediate billing month."

"So understood, it is evident that [Edison] in effect requests the commission to retroactively revise the fuel clause which was in existence prior to February 3, 1975. The purpose of that revision would be to permit [Edison] to recover dollar for dollar its actual fuel expenses, even though the clause as originally adopted did not permit complete and total recovery in a period of steady [sic] rising fuel costs."

Finally, the commission said it was "aware of the potential for negative consequences for [Edison] if those accumulations are written off in too short a period. Consequently, the commission finds that the $26,349,806 should be written off against net income over a period of 10 years."

Edison and the Attorney General filed actions in the circuit court for review of this order. The circuit court vacated the commission order and remanded to the commission with directions to enter an order as proposed by the hearing referee allowing collection of the $26,349,806 over a 12-month period. The commission complied with that direction on October 1, 1976. The collection of the surcharge[5] proceeded while the appeals by the Attorney General and the commission from the circuit judge's decision were pending.

On March 20, 1978, the Court of Appeals reversed and directed the circuit court to remand the cause to the commission for such further action as was necessary.

We granted leave to appeal.[6]

[5] The amount actually collected from customers was only $23,514,-278.

[6] This Court initially denied leave to appeal. 403 Mich 823 (1978). However, Edison's motion for reconsideration was granted and on reconsideration leave to appeal was granted. 403 Mich 853 (1978). On October 27, 1978, this Court stayed the refund of the money collected.

After the cause was argued, we remanded on February 1, 1980, to the commission to take evidence and make specific findings of fact

# I

The Court of Appeals focused on the July 29, 1974, order concerning the accounting treatment of "deferred fuel costs". It said that the commission order in that proceeding did not set rates but, rather, was limited to accounting procedures. The effect of that order was merely to create a "paper" asset, and that bookkeeping entry does not entitle Edison to additional revenues.[7]

Edison did not contend, however, that it was entitled to collect for the two-month lag because it had been authorized to show the amount thereof as an asset on its books. The commission's order of December 22, 1975, acknowledged that Edison made no such claim. The accounting procedures authorized by the commission, rather, simply recognized that Edison spent more money for fuel during the relevant period than it had collected under the fuel adjustment clause.

# II

It is urged that under the February 3, 1975 revised fuel adjustment clause the amount to be collected in February and March 1975 includes the December 1974 and January 1975 fuel adjustment amounts of $26,349,806. Edison responds that the fuel adjustment clause, as revised on February 3, 1975, merely authorizes use of the December and January amounts for the purpose of computing

regarding the method of calculation and figures used by Edison in determining billings for the months of February, March, April, and May of 1975, and particularly as to which fuel adjustment clause was used during those months. The findings after remand were filed by the commission on July 30, 1982.

[7] *The Detroit Edison Co v Public Service Comm,* 82 Mich App 59, 74-75; 266 NW2d 665 (1978).

what is owing for February and March. Merely that the amount so to be calculated is to be partly based on December and January does not mean that Edison has collected for December and January. But, says the commission and the Attorney General, Edison was still authorized to collect for December and January in February and March. Not so, says Edison, we were only authorized to collect February and March costs computed on the basis of December and January, and never collected for December and January. But the commission and the Court of Appeals say that those are just paper entries, and that Edison still collected a sum of money equal to the December and January costs.

We agree with Edison. Once the commission authorized the fuel adjustment clause in February 1974, and then decided in February 1975 to eliminate the billing lag—and that was what the commission said it was doing—Edison was entitled to collect *at some time* for December and January as such. Although February and March were to be calculated on the basis of December and January, Edison never was paid for December and January as such.

The commission's order of December 22, 1975, states in effect that Edison cannot complain because it never was supposed to collect the $26,349,-806. It would always be some amount behind and would never catch up. The only way that it could catch up would be if fuel costs fell to the base level.[8]

---

[8] "The pertinent facts necessary to determine the central question raised by this application are clear and undisputed. Under the fuel cost adjustment clause existing prior to February 3, 1975, there was a billing lag. The result of that lag was that changes in applicant's fuel costs were not recognized in customers' bills until 30 to 60 days after

The commission's order of February 3, 1975, revising the fuel clause, states that the clause "is intended to recover all increases in fuel costs which are beyond applicant's control on a timely basis". The commission's order of December 22, 1975, states that the hearing referee would have allowed collection of the $26 million over a 12-month period. The order states that Edison does not assert that it is entitled to recover the $26 million because of the accounting treatment provided for in the order of July 29, 1974, and that its request should not be denied on the ground that the proceedings do not constitute rate proceedings.

The commission decided against Edison on the ground that Edison is in effect seeking a retroactive revision of the fuel clause:

"So understood, it is evident that applicant in effect requests the commission to retroactively revise the fuel clause which was in existence prior to February 3, 1975. The purpose of that revision would be to permit applicant to recover dollar for dollar its actual fuel expenses, even though the clause as originally adopted did not permit complete and total recovery in a period of steady rising fuel costs.

---

they were incurred. Thus, if fuel costs steadily increased, applicant would spend more for fuel than it collected from its customers through the fuel clause. Conversely, if fuel costs steadily declined, applicant would collect more from its customers through the fuel clause than it actually expended for fuel.

"In Case No. U-4570, the commission revised applicant's fuel clause so that fuel expenditures and revenues from the fuel clause would occur at about the same points in time. Since fuel costs had steadily increased during the preceding period, applicant had not collected through the previous rates, including the fuel clause, all of its actual expenditures for fuel.

"The Order in Case No. F-647 had nothing to do with this undercollection of $26,349,806. It was inherent in applicant's previous fuel clause that the full amount of fuel expenses would not be collected if fuel costs rose above the base fuel cost without at some subsequent time falling below the base cost. The only effect of Case No. F-647 was to display the undercollection separately in Account 174." MPSC Order, December 22, 1975 (Case No. U-4758).

"The commission is persuaded that granting applicant's request would be inappropriate and unfair. The commission is not empowered to establish rates for a past period, but instead is only allowed to engage in prospective ratemaking. At the least, applicant's request comes especially close to violating that principle. The previous fuel clause was adopted after thorough and full hearing in a rate case; if it was an improper or insufficient clause, then applicant should have so argued at that time. Further, applicant's proposal in this proceeding, if adopted, would mean that applicant's present customers would be charged for fuel expenses incurred on behalf of customers during a previous period; clearly, the respective sets of customers may and do consist of different people and entities. Consequently, the commission cannot permit the temporary surcharge requested by applicant to recover the $26,349,806 of undercollection under its previous fuel cost adjustment clause.

"The administrative law judge noted '* * * the underlying commission policy * * * that customers would pay for increased fuel expenses such as those represented by the $26,349,806 involved in these proceedings' as the basis for his recommendation. The administrative law judge's interpretation of commission policy is accurate with regard to the fuel cost adjustment clause of Case No. U-4570, wherein the billing lag was eliminated. However, the policy implicit in applicant's previous fuel clause was not the same as the policy implicit in the clause adopted in Case No. U-4570. The previous clause embodied a policy which contemplated either undercollection or overcollection, depending upon whether the cost of fuel increased or decreased from the basing point. Since fuel costs in fact increased during that period, it is consistent with that policy that applicant bear the burden of the undercollection."

When the commission, in its order of February 3, 1975, stated that Edison shall file an application for a determination in a separate proceeding "as to disposition of the accumulated fuel cost deferral up to the effective date of this order", it was

speaking of expenses (excess fuel costs of $26 million) that had been incurred within just a few months of the date of the order. Edison could not have been expected to have filed an application more immediately than within a few months after the incurrence of the expense.

The rule against retroactive ratemaking does not require that an application for an increase in rates be filed before the incurrence of the expense which is said to justify the increased rate. The rule against retroactive ratemaking precludes the commission from increasing or reducing rates retroactively, but manifestly does not preclude it from acting on the basis of facts that occurred before the order was entered.

Edison is not seeking a retroactive change in the fuel clause, but simply recovery of the $26 million two-month lag which the fuel clause carried forward from month to month until the commission's catch-up order of February 3, 1975, and its order of December 22, 1975, requiring the write-off of that amount.

If Edison had complained about the form of the fuel clause at the time it was first approved by the commission, the commission would no doubt have advanced administrative and other objections to a current collection of the full amount of the excess cost to justify the form of the clause.

There is no reason to suppose that Edison waived the right someday to seek and collect the $26 million merely because it was satisfied at the time the fuel clause was first approved with a two-month lag and to carry forward what grew to $26 million from month to month.

There is nothing in any of the orders which indicates that the commission decided that Edison was never to collect the $26 million until the order

of December 22, 1975, providing that it be written off,[9] at which point Edison acted expeditiously by filing an action in the Ingham Circuit Court less than a month later, on January 19, 1976.

What Edison sought in 1975 and what it was entitled to was some sort of order recognizing its right ultimately to recover, and providing a means by which it would recover, the $26 million two-month lag carried forward for which no provision for collection had as yet been made.

Although the fuel clause as originally established may have provided for an indefinite carrying forward of this amount, it does not follow that Edison could not seek at any time to have the commission provide for the current collection of the amount of the two-month lag or that it had waived the right to seek the current collection of, and ultimately to collect, the $26 million actually expended. It is apparent from the several modifications in less than two years of this fuel clause that fuel clauses are subject to change.

It was beyond the power of the commission to require Edison to write off $26 million of expenses actually incurred.

The Court of Appeals judgment should be reversed.

KAVANAGH and COLEMAN, JJ., concurred with LEVIN, J.

LEVIN, J. The opinion for affirmance states that "a fuel clause that recovers all past costs [is] a

---

[9] "Finally, it is necessary that the proper disposition of the amounts accumulated in Account 174 be determined. The commission is aware of the potential for negative consequences for applicant if those accumulations are written off in too short a period. Consequently, the commission finds that the $26,349,806 should be written off against net income over a period of 10 years." MPSC Order, December 22, 1975 (Case No. U-4758).

'cost of service' tariff" and a fuel clause that "uses past costs to estimate current ones [is] a 'fixed rate tariff' ";[1] that this fuel adjustment clause, approved by the commission in February, 1974, "was not designed to recover past costs";[2] that the statute does not "create a right of the utility to have a particular kind of fuel adjustment clause": "Edison is entitled to whatever" the commission-approved fuel adjustment clause provides.[3] While "it is true that in this case Edison's total [fuel adjustment clause] charges were less than its excess fuel costs", "that is simply one of the risks that any utility operating under our regulatory system takes".[4] In that "analysis", "[t]here was no gap in Edison's billing of fuel costs recoverable under" the fuel adjustment clause.[5]

When this fuel adjustment clause was authorized, there was no prospect of fuel costs being "lower than predicted".[6] This was, as the commission observed, "a period of steady rising fuel costs".[7]

Because fuel costs were moving—in the commission's language, "escalating"[8]—in one direction: up, the two-month lag meant that collection of the excess fuel costs for that period was at least deferred or, as the commission would now have this Court read the fuel adjustment clause, would never occur at all.

[1] *Ante,* p 517.

[2] *Ante,* p 516.

[3] *Ante,* p 524.

[4] *Ante,* p 522.

[5] *Ante,* p 517.

[6] *Ante,* p 523.

[7] Order of December 22, 1975 (Case No. U-4758); see seventh paragraph of the opinion for reversal, *ante,* p 528, for quoted language in context.

[8] Order of February 3, 1975 (Case No. U-4570); see third paragraph of the opinion for reversal *ante,* p 526, for quoted word in context.

While in another context the concept of "estimating" or approximating might be regarded as a fair, albeit a rough accommodation, where that method can only, in light of market conditions, work against the utility, it cannot properly be characterized or justified as even-handed and just "one of the risks that any utility operating under our regulatory system takes".

If this fuel adjustment clause "was not designed to recover past costs" and if Edison could only recover for the $26 million amount of the two-month lag if and when the cost of fuel returned to December 1973 levels, then it was "designed" to assure that Edison would never recover the excess fuel cost for the two-month lag.

While the commission was indeed authorized to design the fuel adjustment clause, Edison need not acquiesce in "whatever" the commission approved. It was not until the entry of the December 22, 1975, order requiring a write-off of the $26 million amount of the two-month lag that Edison knew that the commission (which had given other indications)[9]—ignoring both the reason for providing for adjustment in rates to recover excess fuel costs and the terminological anachronism—would characterize the fuel *adjustment* clause as a *fixed* rate and require a write-off of the $26 million amount of the two-month lag.

In sum, the commission could not, consistently with the purpose of fuel adjustment clauses, design a clause which, as the commission would now have us read it, was bound to fail to recover excess fuel costs, and Edison acted timely when it sought judicial relief as soon as the commission declared

[9] Commission's order of July 29, 1974 (Case No. F-647), speaking of credits subject to "later billing" and "deferred payment"; and the order of February 3, 1975, fn 8 *supra*, speaking of a "billing lag" and "deferred fuel costs" and "accumulated fuel cost deferral".

that the fuel adjustment clause did not contemplate that Edison could ultimately bill customers for the amount of the two-month lag.

RILEY, J., took no part in the decision of this case.