MAY 25, 1983

THE DETROIT EDISON COMPANY v PUBLIC SERVICE COMMISSION. (Docket Nos. 61294, 61295.) Rehearing denied. *Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Hugh B. Anderson,* Assistant Attorney General, for plaintiff-appellee Attorney General. *Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Don L. Keskey* and *S. David Kutinsky,* Assistants Attorney General, for defendant-appellee Public Service Commission. *Foster, Swift, Collins & Coey, P.C.,* and *Leon S. Cohan, Christopher C. Nern,* and *A. Robert Pierce, Jr.,* for intervening defendant-appellant The Detroit Edison Company. Reported at 416 Mich 510.

BOYLE, J., not participating.

KAVANAGH, J., would grant rehearing.

LEVIN, J., would grant the motion for rehearing and says:

Detroit Edison has filed a motion for rehearing of this Court's December, 1982, decision sustaining an appropriation of $23,500,000 of Detroit Edison's capital. The motion should be granted and the case once again set down for plenary hearing and decision.

On December 22, 1975, the Michigan Public Service Commission entered an order requiring Detroit Edison to write off accumulated deferred fuel costs of approximately $26,350,000 against net income over a period of ten years. The circuit court reversed, and Detroit Edison was authorized to collect the deferred fuel costs from its customers over a 12-month period; Detroit Edison actually collected approximately $23,500,000.

In March, 1978, the Court of Appeals reversed the circuit court. In December 1982, the Court of Appeals was affirmed by an equal

division in this Court. Chief Justice FITZGERALD's opinion for affirmance was signed by Justices WILLIAMS and RYAN. I wrote for reversal and Justices KAVANAGH and COLEMAN signed that opinion. *The Detroit Edison Co v Public Service Comm,* 416 Mich 510 (1982).

I

On February 4, 1974, the commission authorized Detroit Edison to add a fuel adjustment clause for domestic service, the adjustment to apply to the second billing month following the calendar month in which the fuel is burned.[1] On July 29, 1974, Detroit Edison was authorized to set up on its balance sheet as an asset the "fuel expense" to be collected two months hence.[2] On February 3, 1975, the commission revised the fuel adjustment clause to eliminate the two-month lag, and Detroit Edison was directed to file an application with the commission for a determination of the disposition of the accumulated fuel cost deferral.[3]

---

[1] The order authorized Detroit Edison to incorporate a fuel adjustment clause for domestic electric service and approved revised rate schedules, for service rendered on and after February 5, 1974, stating that "[t]he adjustment shall apply to the second billing month following the calendar month in which the fuel is burned".

[2] The order states that Detroit Edison had "experienced rapid and substantial increases in fuel costs since December 1973, and expects such increases to continue"; "there is a lag of about two months in implementing revised fuel clause billing calculations for domestic and commercial customers"; "[b]ecause of the lags referred to above in implementing revised fuel clause billing calculations, there is thus not a proper matching of fuel clause revenue adjustments with the corresponding changes in fuel costs"; that Detroit Edison had agreed that the proposed change in accounting treatment "shall not serve as a basis in whole or in part, directly or indirectly, for a rate base or cost of service greater than would be determined had such accounting entries, treatment and interpretation not been made or approved, all without prejudice to the right of The Detroit Edison Company to request the benefit in rate proceedings of future orders of the commission which establish accounting entries, interpretations or treatments other than those established in this proceeding".

The commission order further states that Detroit Edison was authorized and directed to adopt revised accounting procedures for its fuel expense so that, "[t]o the extent that costs of fuel burned in any month * * * are subject to billing in a later month, * * * such costs * * * shall be deferred until such time as they are reflected in billing adjustments made pursuant to such fuel cost adjustment clauses". "The deferred fuel expense * * * shall be charged * * * to operations in the amount of revenue billed * * * under the applicable approved fuel clause for the particular month." "This [accounting change] shall not cause an increase in rate base or cost of service, for ratemaking purposes."

[3] The order states that the fuel adjustment clause "is *intended to*

Detroit Edison filed such an application. A hearing referee found that Detroit Edison had "experienced an increase in the cost of fuel consumed [during a part of December, 1974 and January, 1975] which

*recover all increases* in fuel costs which are beyond applicant's [Detroit Edison's] control on a timely basis". "The commission finds, however, that applicants currently approved [fuel adjustment clause] does not in fact achieve the goal of fully recognizing changes in fuel costs in a timely manner. Therefore the commission finds it necessary to correct the operation of the clause to reduce the existing time lag between the incurring and the reflecting of increased or decreased costs of fuel in the fuel adjustment. This lag has become a significant problem with rapidly escalating cost of fuels and with the potential assessment of proposed new taxes on these fuels." (Emphasis supplied.)

The commission referred to its July 29, 1974, order, granting Detroit Edison permission to record increases in the cost of fuel burned for electric service *"not recovered through operation of the [fuel adjustment clause]* in a balance sheet account rather than an income statement account," and stated, "[t]his was approved since applicant was experiencing a significant lag in the recovery of higher fuel costs. * * * As a result of this accounting treatment, net income per books could no longer be adversely affected during a period of rising fuel costs by the lag contained within the [fuel adjustment clause] provision. * * * Cash flow, however, continued to be adversely affected since applicant was *unable to offset a significant portion of its increased fuel expense outlays with increased revenue."* (Emphasis supplied.)

The commission found that the fuel adjustment clause "should be modified with respect to the procedure used in determining the appropriate billing month adjustment factor so as to effectively eliminate the lag. * * * As modified, the clause will effectively eliminate any annual under-collection or over-collection of incurred costs of fuel burned by applicant while continuing to calculate the adjustment factor on the basis of actual fuel cost data."

The findings conclude with the statement that "[s]ince this modification of the [fuel adjustment clause] effectively eliminates the lag, it also removes the need of applicant's accounting for deferred fuel costs as directed" by the July 29, 1974, order. "As such, applicant shall file an application with the commission for a determination in a separate proceeding as to disposition of the accumulated fuel cost deferral up to the effective date of this order."

The revised fuel adjustment clause, attached to the order, continued to provide that "[t]he fuel adjustment shall be applied to the second billing month following the calendar month in which the fuel is burned." It further stated that "[t]o correct for the two-month lag between cost incurrence and billing adjustment, the increase or decrease in the charge per kWh as determined above shall be appropriately increased or decreased by the difference between the 'two-month lag' adjustment factor applied in the second immediately preceding billing month and the 'two-month lag' adjustment factor to be applied for the immediate billing month."

exceeded by $26,349,806 the existing respective base points for fuel cost adjustment calculations, and which under the then existing procedures, would have been recoverable from and billed to customers in February and March 1975", and that said sum is reflected by Detroit Edison in the account in which deferred fuel costs were required to be set forth by the July 29, 1974, order. The hearing referee further found that the February 3, 1975, order had established a new fuel adjustment clause "that substantially eliminated the previous 'billing lag' for fuel costs occurring after February 3, 1975, thereby vitiating the need for future accumulations of deferred fuel costs". The hearing referee further stated:

"There is nothing in the record to support a finding that the cost of fuel should be written off against net income, and the staff's position is asserted without any probative evidence to justify altering the premise that the applicant's customers should pay for the cost of fuel incurred on their behalf. On the other hand, the evidence submitted by the applicant persuasively establishes that if applicant is not permitted to recover the deferred fuel costs from its customers, then the applicant must, in effect, write off an asset account of $26,349,806 against its common equity."

The hearing referee recommended that the accumulated deferred fuel costs be billed to customers over a 12-month period.

On December 22, 1975, the commission rejected his recommendation and ordered the write-off over a ten-year period of the $26,350,-000 accumulated fuel cost deferral. The commission acknowledged that "during part of December 1974 and part of January 1975" Detroit Edison had experienced "an increase in costs of fuel consumed" and that, during that period, its "actual fuel costs exceeded the amount it was able to recover under the fuel cost adjustment clause which existed at that time by $26,349,806".[4]

---

[4] The commission further acknowledged that Detroit Edison had not recovered all of its actual expenditures. Speaking of the February 3, 1975, order, which directed the elimination of the billing lag, the commission stated that it had revised Detroit Edison's "fuel clause so that fuel expenditures and revenues from the fuel clause would occur at about the same points in time. Since fuel costs have steadily increased during the preceding period, applicant had not collected through the previous rates, including the fuel clause, all of its actual expenditures for fuel."

The staff of the commission advanced three arguments for rejecting the hearing referee's recommendations, all of which were rejected by the commission. The commission ruled against Detroit Edison, rather, because it was "inherent in [the fuel adjustment clause] that the full amount of fuel expenses would not be collected if fuel costs rose above the base fuel cost without at some subsequent time falling below the base cost". The commission continued that the effect of the July 29,

II

Although appellees assert that Detroit Edison has recovered the deferred fuel costs, it clearly appears from the findings of the hearing referee and the orders of the commission and it is implicit in the analysis of the opinion for affirmance in this Court that Detroit Edison did not, before the circuit court order authorizing it to do so was entered, recover the $23,500,000 from its customers.

The opinion for affirmance states that the fuel clause "was *not designed* to recover all past costs, but was intended only to estimate current costs on the basis of past experience". *Detroit Edison Co v Public Service Comm, supra,* p 515. (Emphasis supplied.)

The opinion for affirmance begins by stating the first issue posed in this Court's order granting leave to appeal but does not address another issue posed in that order: "If the utility is not allowed the proposed surcharge, would confiscation result?" 403 Mich 853 (1978).

A fuel clause "not designed to recover all past costs", which, in a period of rising costs, "inherently"[5] must fail to do so, does not constitute an appropriate exercise of the power confided to the commission. The commission failed to justify the "designing" of a fuel clause which "inherently" requires Edison to absorb and charge its stockholders, rather than its customers, for $23,500,000 of actual fuel costs.

In allowing Detroit Edison to set up as an asset on its books accumulated deferred fuel costs of $26,350,000, the commission, in effect, represented that the amount was a true asset, and not a "paper asset" as the Court of Appeals[6] incorrectly characterized it. Surely the commission does not authorize public utilities to "display"[7] "paper assets". To do so would be to mislead stockholders, investors, and the public.

The opinion for affirmance states that three features of the fuel clause demonstrate that the fuel clause was intended only to "estimate" current costs on the basis of past experience. Detroit Edison asserts in its motion for rehearing that those features are generally characteristic of utility rates, billing, and collection. Detroit Edison states that there cannot be an exact match between the month of expenditure and the month of billing. Meters are read every other

1974, order authorizing Detroit Edison to set up on its balance sheet the deferred fuel expense was "to display the *under-collection* separately". (Emphasis supplied.)

[5] See fn 4.

[6] 82 Mich App 59, 76 (1978).

[7] See fn 4.

month, necessitating an estimate of actual usage for each month of the two-month period. Meters are read on 20 different days in each month for a total of 40 different days. The meter of only 1 customer in 20 is read on the first day of the month. It is not practical, because of the small amounts involved, to bill former customers. Detroit Edison explains further that the fuel clause did not become effective until after the test year used in the prior rate case.

It appears that utility rates and fuel clauses inevitably incorporate estimates made on the basis of past experience. But that does not gainsay that Detroit Edison is entitled to have a fuel clause designed, although it may incorporate estimates based on past experience, to recover all its actual fuel costs and that the commission may not justifiably require Detroit Edison to write off $26,500,000 of actual deferred fuel costs.

The three features relied on in the opinion for affirmance concern, Detroit Edison points out, matters upon which the record is largely silent. The argument based on the three features reflects inferences based on assumptions unsupported by an evidentiary record and untested by adversary presentation.

The orders of the commission stated that the purpose of the fuel clause was to permit Detroit Edison to recoup past costs and spoke of billing lags and deferred fuel costs. The commission should not be allowed to recharacterize the purpose and functioning of the fuel clause, and then criticize Detroit Edison for not complaining earlier, for not anticipating that the commission would adopt a new characterization.[8]

The motion for rehearing states that the opinions from other jurisdictions relied on in the opinion for affirmance are factually and legally distinguishable because they relate to wholesale rates for sales of electricity by one utility to another utility, and fuel clauses drafted under regulatory schemes which allow the utility to draft its own clause which then may properly be construed against the drafter. Applying the same concept here, this fuel clause might properly be construed against its drafter, the commission.

In sum, the effect and result is to appropriate $23,500,000 of Detroit Edison's capital by recharacterization by a new commission of prior orders of the commission, and affirmance by an equal division of this Court on an analysis grounded in factual assumptions which have not been tested in the crucible of adversary presentation and decisions from other jurisdictions which may concern dissimilar factual and legal questions.[9]

---

[8] The membership of the commission changed between February, 1975 and December, 1975.

[9] The amount to be refunded, including accrued interest, will exceed

JUNE 23, 1983

PROPOSED AMENDMENTS OF GCR 1963, 726, 727, AND 729. On order of the Court, this is to advise that the Court is considering whether to amend GCR 1963, 726, 727, and 729. Before determining whether the proposal should be adopted, changed before adoption, or rejected, this notice is given to afford any interested person the opportunity to comment on the form or the merits of the proposal, the text of which is as follows:

(The present language is to be repealed and replaced by the following language unless otherwise indicated below:)

RULE 726. ATTORNEY FEES, EXPENSES, TEMPORARY ALIMONY, AND CHILD SUPPORT.

.1—.4 (Unchanged.)

.5 Temporary Child Support Order.

(1) The friend of the court shall make available to the attorney for each party and to each party the recommendation on a temporary support motion or complaint when that recommendation is filed.

(2)-(3) (Unchanged.)

RULE 727. POWERS AND DUTIES OF THE FRIEND OF THE COURT.

.1—.3 (Unchanged.)

.4 Procedure in Support Payment Delinquencies. The procedure in support payment delinquencies is governed by MCL 552.511 and 552.601-552.650; MSA 25.176(11) and 25.164(1)-25.164(50).

.5 Informational Pamphlet. The friend of the court shall make the informational pamphlet (MCL 552.505[a]; MSA 25.176[5][a]) available to lawyers. In a domestic relations matter, the plaintiff's lawyer shall provide a copy of the informational pamphlet to the plaintiff when the plaintiff decides to file the complaint or as soon as possible after

---

$35,000,000. It is noteworthy that although the refund is justified in part on the basis that otherwise there would not be a precise match between usage, at the time the fuel expense was incurred some eight years ago, and billing some two months later, this refund will probably be made to a substantial number of customers who were not customers eight years ago. This, I think, substantiates that the features relied on in the opinion for affirmance are inherent in utility billing, collection, and refund and not a reason for deciding this dispute one way or another.