**ALASKA EXCHANGE CARRIERS ASSOCIATION, INC.,**
Appellant,

v.

**REGULATORY COMMISSION OF ALASKA, Appellee.**

No. S–12696.

Supreme Court of Alaska.

Feb. 27, 2009.

Robin O. Brena, Anthony S. Guerriero, David W. Wensel, Brena, Bell & Clarkson, P.C., Anchorage, for Appellant.

Robert E. Stoller, Assistant Attorney General, Anchorage, Talis J. Colberg, Attorney General, Juneau, for Appellee Regulatory Commission of Alaska. Martin Weinstein, General Communication, Inc., Anchorage, for Appellee GCI.

A. William Saupe, Ashburn & Mason, Anchorage, for Appellee Alascom, Inc.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

WINFREE, Justice.

## I. INTRODUCTION

A local telephone company proposed moving its first point of switching for routing telephone traffic. Two long-distance carriers affected by the proposal opposed the change, and an association of local telephone companies sought to intervene in the ensuing regulatory proceeding. The agency denied intervention, the superior court affirmed, and the association appeals. We affirm denial of intervention because the agency reasonably concluded that the association did not qualify for mandatory intervention and did not abuse its discretion in denying permissive intervention.

## II. FACTS AND PROCEEDINGS

Long-distance telephone companies (interexchange carriers, or IXCs) need the facilities of local telephone companies (local exchange companies, or LECs) to originate and terminate intrastate toll calls.[1] Prior to 1989 long-distance carriers compensated local telephone companies for use of their facilities through a "settlements" process.[2] In 1989 the Alaska Public Utilities Commission, predecessor to the Regulatory Commission of Alaska (collectively, Commission), created the Alaska Exchange Carriers Association, Inc. (AECA), an association of local telephone companies.[3] Creation of AECA represented a shift from the settlements process to one involving tariffed access charges.[4]

Under the old settlements process, each long-distance telephone company negotiated with each local carrier individually.[5] Under the new system, AECA calculates a single access charge tariff for all of its members.[6] The tariff:

[R]efers to the contract of the 21 members of AECA wherein they agree to share facilities and services with intrastate long-distance companies, related to long-distance calls originating from or coming into Alaska. The tariff also lays out a system of access charges that the local carriers charge the long-distance carriers for use of their networks.

In October 2006 AECA member Interior Telephone Company, Inc. petitioned for authorization to move its first point of switching, following procedures outlined in AECA's tariff. The first point of switching is:

The first exchange carrier location at which switching occurs on the terminating path of a call proceeding from the IXC

---

1. *See, e.g.,* Alaska Pub. Util. Comm'n, *Re Intrastate Access Charges & Subscriber Line Charges,* 10 A.P.U.C. 34, 36–37 (1989).

2. *Id.*

3. *See id.* at 39.

4. *Id.* at 38. AS 42.05.830 provides for the establishment of "a system of access charges to be paid by long distance carriers to compensate local exchange carriers for the cost of originating and terminating long distance services."

5. *Id.* at 37.

6. *Id.* at 39. In Alaska, a tariff specifies the terms and conditions under which a utility offers services to the general public. AS 42.05.990(7).

terminal location to the terminating end office, or the last exchange carrier location at which switching occurs on the originating path of a call proceeding from the originating end office to the IXC terminal location.[7]

Put another way, a switch is a device that routes telephone traffic, and the first point of switching, or FPOS, is the physical point where a local AECA member company interconnects with an interstate long-distance service provider. According to Interior Telephone, moving the FPOS would benefit consumers by making additional services available in a cost-efficient manner. Two long-distance telephone companies, GCI Communication Corp. d/b/a General Communication, Inc. and Alascom, Inc. d/b/a AT & T Alascom, opposed Interior Telephone's proposed FPOS change partly because they believed it would impermissibly shift some costs to them.

The Commission designated GCI and AT & T as parties to the regulatory proceeding without requiring petitions to intervene, noting that AECA's tariff "anticipates that objecting access customers will participate in a proceeding before the commission." The Commission further stated: "We require any interested person wishing to file a petition to intervene in this proceeding to file that petition by October 20, 2006. Our criteria for evaluating petitions to intervene are set out at 3 AAC 48.110." [8]

AECA timely filed a petition to intervene, arguing that under 3 AAC 48.110 it had a statutory right to intervene or it qualified for permissive intervention. Interior Telephone supported the petition; GCI and AT & T each filed an opposition.

On November 30 the Commission denied AECA's petition to intervene, likening the case to Docket U–99–81, in which the Commission had previously decided AECA neither had a statutory right to intervene nor qualified for permissive intervention.[9] On December 12 AECA filed a petition for reconsideration and moved for expedited consideration. On December 20 Interior Telephone filed a memorandum supporting AECA's petition; that same day, GCI and AT & T each filed an opposition.

On December 28 the Commission granted AECA's motion for expedited consideration but denied its petition for reconsideration. The Commission reiterated that AECA had no statutory right to intervene and that permissive intervention was not warranted. AECA appealed to the superior court, and Superior Court Judge Sen K. Tan affirmed denial of AECA's intervention motion in April 2007.

In June 2007 the Commission held a public hearing on Interior Telephone's petition to change the FPOS. The Commission denied the petition in October.

AECA appeals the denial of intervention.

## III. STANDARD OF REVIEW

When a superior court acts as an intermediate court of appeals, we independently review the administrative decision.[10] Where questions of law do not involve agency expertise, the appropriate standard of review is "substitution of judgment"; where agency expertise is implicated, the "rational basis" standard applies.[11] Under the "substitution of judgment" standard, we make our own

---

7. NEWTON's TELECOM DICTIONARY 393 (22d ed.2006).

8. 3 Alaska Administrative Code (AAC) 48.110(a) (2008) provides:

> Petitions for permission to intervene as a party will be considered only in those cases that are to be decided upon an evidentiary record after notice and hearing. Any person who has a statutory right to be made a party to that proceeding will be permitted to intervene. Any person whose intervention will be conducive to the ends of justice and will not unduly delay the conduct of the proceeding will, in the commission's discretion, be permitted to intervene.

9. *GCI Commc'n Corp. v. Tel. Utils. of the Northland, Inc.*, Docket U–99–81, Order No. 1, at 12 (Regulatory Comm'n of Alaska, Nov. 1, 1999).

10. *E.g., Cook Inlet Pipe Line Co. v. Alaska Pub. Utils. Comm'n*, 836 P.2d 343, 348 (Alaska 1992) (citing *Tesoro Alaska Petrol. Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987)).

11. *Tesoro*, 746 P.2d at 903 (citing, *e.g., Matanuska–Susitna Borough v. Hammond*, 726 P.2d 166, 175–77 (Alaska 1986)).

legal interpretations.[12] Under the "rational basis" standard, we defer to agency interpretation if it is supported by the facts and has a reasonable basis in law.[13] We review an agency's application of its own regulations for whether the agency's decision was "arbitrary, unreasonable, or an abuse of discretion."[14] Findings of fact are reviewed for clear error under the "substantial evidence" standard.[15] Findings are upheld if they are "supported by relevant evidence that a reasonable person might accept as adequate to support them."[16]

Here, the proper standards of review are (1) "rational basis" for whether AECA qualifies for intervention as a matter of right under 3 AAC 48.110, because the Commission is in a superior position to interpret its own regulation, and (2) "abuse of discretion" for whether AECA qualifies for permissive intervention under 3 AAC 48.110, because the Commission is applying its own regulation to the facts of the case.

## IV. DISCUSSION

### A. Arguments and Rulings Below

AECA first argues that it has a statutory right to intervene under 3 AAC 48.110(a), which provides: "Any person who has a statutory right to be made a party ... will be permitted to intervene." AECA concedes that "there is no express provision of the Utilities Act stating that a utility or its ratepayers may be heard with regard to issues arising under a tariff." But according to AECA, the "basic tenet, that a party may be heard with regard to disputes arising under its own tariff," is "implied in virtually every tariff-related provision of the Utilities Act." AECA argues that the issues in this case affect AECA as a whole, as well as AECA's tariff, AECA's billing and collection of access charges, AECA's distribution of access

charge revenues, and AECA's twenty other member companies.

AECA also argues that it qualifies for permissive intervention under another portion of 3 AAC 48.110(a), which provides: "Any person whose intervention will be conducive to the ends of justice and will not unduly delay the conduct of the proceeding will, in the commission's discretion, be permitted to intervene." 3 AAC 48.110(b) specifies seven permissive intervention factors:

> In passing upon a petition to intervene, the following factors, among others, will be considered:
>
> (1) the nature of the petitioner's right under statute to be made a party to the proceeding;
>
> (2) the nature and extent of the property, financial, or other interest of the petitioner;
>
> (3) the effect on petitioner's interest of the order which may be entered in the proceeding;
>
> (4) the availability of other means by which the petitioner's interest may be protected;
>
> (5) the extent to which petitioner's interest will be represented by existing parties;
>
> (6) the extent to which petitioner's participation may reasonably be expected to assist in the development of a sound record, including the issues that petitioner intends to address in the proceeding; and
>
> (7) the extent to which participation of the petitioner will broaden the issue or delay the proceeding.

The Commission found the facts and circumstances of this case "substantially identical" to those in Docket U–99–81 and, "for the same reasons" as in that case, denied AECA's petition. The local telephone company in Docket U–99–81 had moved its first point of switching from North Pole to Fair-

12. *Id.*

13. *Id.*

14. *Griffiths v. Andy's Body & Frame, Inc.,* 165 P.3d 619, 623 (Alaska 2007) (quoting *Hodges v. Alaska Constructors, Inc.,* 957 P.2d 957, 960 (Alaska 1998)).

15. *Matanuska Elec. Ass'n, Inc. v. Chugach Elec. Ass'n, Inc.,* 53 P.3d 578, 583 (Alaska 2002) (citing *Tlingit–Haida Reg'l Elec. Auth. v. State,* 15 P.3d 754, 761 (Alaska 2001)).

16. *Amerada Hess Pipeline Corp. v. Regulatory Comm'n of Alaska,* 176 P.3d 667, 673 (Alaska 2008) (citing *Alyeska Pipeline Serv. Co. v. DeShong,* 77 P.3d 1227, 1231 (2003)).

banks.[17] The tariff then in effect required local and long-distance carriers to agree to change the first point of switching, but the carriers had not reached an agreement.[18] AECA attempted to intervene, arguing—as it does in this case—that it had a statutory right to intervene "in any proceeding in which the interpretation and application of its tariff is at issue." [19] The Commission rejected that argument.[20] The Commission considered the permissive intervention factors of 3 AAC 48.110(b), but denied AECA's motion to intervene, noting that: (1) neither AECA's property nor financial interests were affected; (2) although AECA's input "could arguably" assist the Commission, proper interpretation of the tariff was within the Commission's purview; (3) AECA's participation could not reasonably assist in developing a sound record because the local and long-distance carriers already had presented both sides of the issue; and (4) AECA's participation could actually delay proceedings.[21]

The Commission also noted that AECA "fail[ed] to acknowledge [the order in Docket U–99–81] in its petition." In denying AECA's subsequent motion for reconsideration, the Commission stated that AECA had no statutory right to intervene and that intervention based on the discretionary intervention factors was not warranted.

The superior court affirmed the Commission's decision, first reiterating that no express statutory right of intervention existed. The court reasoned that whether the term "statutory" in 3 AAC 48.110(a) encompassed implied statutory rights was a matter of the Commission's interpretation of its own regulations, and thus subject to the "reasonable basis" standard of review. The court concluded that "[b]ased on the language of the regulation," a reasonable basis existed for the Commission to deny AECA intervention.

The court then stated that while some permissive intervention factors weighed in favor of allowing intervention, others weighed against it, and it concluded the Commission had not abused its discretion in denying AECA's motion for permissive intervention. The court noted that the only section of the tariff at issue was § 2.6, which "deals only with obligations of the parties before a petition is filed," and that the tariff did not address "what happens after the petition is filed with the Commission." Thus, the court reasoned, "the tariff is really not central to the issue currently before the Commission. Rather, the docket is concerned with how the Commission will decide the FPOS issue."

**B. The Commission Reasonably Concluded that AECA Does Not Qualify for Express or Implied Mandatory Intervention.**

■ AECA concedes it has no express statutory right to intervene, but asserts that a "regulated entity is automatically given party status in a proceeding in which its own tariff is at issue without the need to intervene at all." AECA relies on § 603(b) of the Commission's access charge manual [22] and § 1.3 of AECA's tariff to support this assertion.[23] AT & T contends that the access charge manual and relevant statutory and regulatory authority "evince a narrow role for AECA, focused exclusively on assessing, collecting, and distributing access charges."

17. Docket U–99–81, *supra* note 9, at 12.

18. *Id.* at 10, 12.

19. *Id.* at 7.

20. *See id.* at 17.

21. *Id.* at 16–17.

22. Regulatory Comm'n of Alaska, *Alaska Intrastate Interexchange Access Charge Manual* § 603(b) (2006) *available at* <http://www.alaska.net/aeca/AIIACM—June 14, 2006.pdf>. The manual provides: "Participation in Commission or court proceedings relating to the Association's access charge tariff, the billing and collection of the Association's access charges, or the distribution of the Association's access charge revenues shall be deemed to be authorized Association activities."

23. Alaska Pub. Util. Comm'n *Access Services Tariff* 999 § 1.3 (1997), provides that AECA "has the primary responsibility for preparing, filing, and supporting this tariff; billing and collecting access charges; handling disputes; and distributing access charge revenues to the individual companies."

GCI and the Commission make similar arguments.

AECA's argument fails because its role is essentially that of an administrator. The Alaska Public Utilities Regulatory Act[24] authorized the Commission to form "an association to assist in administering the system of access charges."[25] When the Commission created AECA in 1989, it stated:

[We believe] that organization of an ECA will be of significant benefit in the development, implementation, and administration of access charges. The ECA will have primary responsibility for preparing, filing, and supporting the single, statewide average access charge tariff required by the Commission and for recommending ratios for distributing resultant revenues to the LECs. Further, the ECA will handle the functions of collecting the approved rates and distributing the carrier access revenues pursuant to the approved distribution ratios and other applicable Commission rules. The ECA will also have monitoring report filing responsibilities and other obligations to its members. . . .

None of the foregoing functions of the ECA involve any delegation by the Commission of its duties and powers. The Commission, not the ECA, will approve tariffs for, and rules governing, access charges and ratios for appropriate distribution of access charge revenues among LECs.[26]

A change in FPOS "relates to" AECA's tariff only in the sense that AECA will need to prepare, file, and distribute a revised access charge. The statute authorizing AECA's creation explicitly refers to AECA's role in administering access charges.[27] The tariff language states that AECA's role is limited to billing and collecting access charges, distributing access charge revenues, and similar functions. The Commission expressly stated that it did not cede any of its duties or powers to AECA.[28] Thus, although AECA's tariff is "at issue" in the sense that it provides the context for the proposed change in FPOS, AECA's role as an administrator is insufficient to warrant automatic party status in the proceeding.[29]

AECA contends that proceedings before the Commission involved "considerable evidence on the proper application and interpretation of AECA's tariff" and that "evidence concerning the proper interpretation and application of AECA's FPOS provisions was actually introduced in the underlying docket over the objections of GCI and AT & T." Interpretation of the tariff was at issue in those proceedings only insofar as ITC unsuccessfully argued that the tariff contained standards relevant to the Commission's decision on the proposed FPOS change.[30] The Commission flatly rejected this argument, noting that the tariff merely provided for alternative dispute resolution procedures for

**24.** AS 42.05.

**25.** AS 42.05.850 provides: "The commission may require the local exchange carriers to form an association to assist in administering the system of access charges and may require the association to file tariffs and to engage in pooling of exchange access costs and revenue if necessary. . . ." A local exchange carrier is "any carrier certificated to provide local telephone services." AS 42.05.890(1).

**26.** *Intrastate Access Charges, supra* note 1, at 39.

**27.** *See* AS 42.05.850.

**28.** *Intrastate Access Charges, supra* note 1, at 39.

**29.** AECA claims that § 2.6 of its tariff authorizes intervention. But that section merely requires local telephone companies to give the Commission and access customers notice of any proposed changes to the FPOS and delineates the

process by which access customers may object to proposed changes. *Access Services Tariff, supra* note 23 at § 2.6(A–F).

AECA also points to Docket U–00–88, in which the Commission allowed an oil company and two natural gas companies to intervene because "[c]ustomers of a public utility have a statutory right to participate as a party [*sic*] in utility proceedings" and the companies would have had standing to seek judicial review. *In Re Investigation into 2000 Revenue Requirement & Cost of Svc. Studies,* Docket U–00–88, Order No. 2 at 4 (Regulatory Comm'n of Alaska, Feb. 5, 2001). Docket U–00–88 is distinguishable from this case because AECA is not a customer of a public utility.

**30.** *In Re Petition Filed by Interior Tel. Co., Inc. to Implement a Proposed Network Change Under Alaska Exchange Carriers Ass'n, Inc., Tariff Section 2.6(f),* Docket U–06–109, Order No. 10 at 3 (Regulatory Comm'n of Alaska, June 6, 2007).

a proposed FPOS change, and that "[o]nce a petition is filed, the role of the tariff ends." [31] Because the tariff was not actually at issue, the Commission's decision that AECA did not have an implied statutory right to participate in the proceedings is reasonable in light of AECA's narrow administrative role.

■ AECA also asserts that its authorized activities are "nearly identical" to those of the National Exchange Carrier Association (NECA). The Federal Communications Commission (FCC) has stated that "NECA may freely express its views before [the FCC] whenever it chooses to do so" and that "it would be an error to restrict ... the free expression of NECA's views in proceedings" before the FCC.[32] NECA's role as an administrator is indeed analogous to that of AECA. A National Regulatory Research Institute report on NECA lists NECA's purposes as "filing common access charge tariffs for exchange carriers, administering access charge revenue pools, and distributing the pool revenues." [33] Regarding legal matters, the report states: "NECA's functions are confined to those activities related to the development and filing of access charges and the collection and distribution of access charge revenues, including involvement in related judicial and regulatory proceedings. Any other activity is prohibited unless prior Commission approval has been granted." [34] Title 47 of the *Code of Federal Regulations* supports the report's characterization:

> Section 69.603 Association functions.
>
> (a) [NECA] shall not engage in any activity that is not related to the preparation of access charge tariffs or the collection and distribution of access charge revenues or the operation of a billing and collection pool on an untariffed basis unless such activity is expressly authorized by order of the [FCC].

(b) Participation in [FCC] or court proceedings relating to access charge tariffs, the billing and collection of access charges, the distribution of access charge revenues, or the operation of a billing and collection pool on an untariffed basis shall be deemed to be authorized [NECA] activities.[35]

However, AECA's reliance on NECA is unpersuasive for two reasons. First, the authority AECA cites does not expressly provide NECA an unfettered right to intervene *as a party* in all regulatory proceedings involving its members that may touch upon its tariff,[36] nor have we found any such authority.[37] Second, the Commission is not bound to follow the FCC. Thus the Commission had a reasonable basis for concluding that AECA may not intervene as a matter of right: no statute expressly provides for such a right, and no implied right exists because AECA's role is limited to administering the system of access charges.

## C. The Commission Was Within Its Discretion To Deny AECA Permissive Intervention.

■ AECA asserts that it meets the permissive intervention criteria set out in 3 AAC 48.110(a) and (b). Specifically, AECA claims that: (1) it has a direct interest in the tariff's interpretation and application; (2) any Commission ruling concerning the tariff will impact it and its members; (3) only through intervention can it protect its interests; (4) no other party can represent its unique interest or present its unique perspective; (5) its institutional knowledge about development of § 2.6 of the tariff will assist in developing a complete record; and (6) far from intending to broaden the issue or delay proceedings, it already had timely filed testimony and agreed to an expedited procedural schedule.

---

**31.** *Id.* at 4.

**32.** *In re Amendment & Clarification of Part 69 Rules Governing the Nat'l Exch. Carrier Ass'n,* 2 F.C.C.R. 381, 382 (1987).

**33.** Jane L. Racster, Nat'l Regulatory Research Inst., The Nat'l Exch. Carrier Ass'n: Structure and Operation, 1–2 (1985).

**34.** *Id.* at 10.

**35.** 47 C.F.R. § 69.603(a)-(b) (2007).

**36.** *See* 2 F.C.C.R. at 381–85.

**37.** *But see, e.g., In re C.F.Commc'ns Corp. v. Mich. Bell Tel. Co.,* 12 F.C.C.R. 2134, 2144 (1997) (granting NECA leave to intervene as amicus curiae).

Our inquiry is limited to whether the Commission's application of the permissive intervention factors to the facts of this case was "arbitrary, unreasonable, or an abuse of discretion." [38] Although the Commission's initial ruling was limited to analogizing this case to Docket U–99–81, in denying reconsideration the Commission explicitly stated that AECA failed to satisfy the second, sixth, and seventh permissive intervention factors. It found AECA's "claimed interest in the interpretation and application of its tariff" was insufficient, and although its members' property or financial interests may qualify them for intervention, AECA "as an organization has not demonstrated such a property or financial interest." Additionally, the Commission found AECA's institutional knowledge about adoption of § 2.6 of the tariff would not assist in developing a sound record and "intervention on the part of AECA to provide this institutional knowledge may de-

lay the proceeding." Those findings are not clearly erroneous, and based on those findings, the Commission reasonably denied AECA's petition to intervene.

## V. CONCLUSION

Because the Commission reasonably concluded that AECA does not qualify for mandatory intervention under 3 AAC 48.110, and because the Commission did not abuse its discretion in denying permissive intervention under that regulation, we AFFIRM the denial of AECA's intervention in the underlying regulatory proceeding.

---

**38.** *Griffiths*, 165 P.3d at 623 (quoting *Hodges v. Alaska Constructors, Inc.*, 957 P.2d 957, 960 (Alaska 1998)).