ALASKA EXCHANGE CARRIERS
ASSOCIATION, INC.,
Appellant,

v.

REGULATORY COMMISSION OF ALAS-
KA, General Communications, Inc., d/b/a
General Communications, Corp., d/b/a
GCI, and Alascom, Inc., d/b/a AT & T
ALASCOM, Appellees.

No. S–13528.

Supreme Court of Alaska.

Oct. 7, 2011.

Rehearing Denied Nov. 3, 2011.

Robin O. Brena and Anthony S. Guerriero, Brena, Bell & Clarkson, P.C., Anchorage, for Appellant.

Robert E. Stoller, Senior Assistant Attorney General, Stuart W. Goering, Assistant Attorney General, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for Appellee Regulatory Commission of Alaska.

James R. Jackson and Martin M. Weinstein, Anchorage, for Appellee General Communications, Inc. d/b/a GCI.

Notice of non-participation filed by Robert A. Royce, Ashburn & Mason P.C., Anchorage, for Appellee Alascom, Inc., d/b/a AT & T Alascom.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

## OPINION

CHRISTEN, Justice.

## I. INTRODUCTION

Six weeks after the Regulatory Commission of Alaska approved the 2007 Access Charge Rates long distance telephone companies pay to local telephone companies, an association of local telephone companies realized that five of the rates the Regulatory Commission approved were based upon an erroneous spreadsheet the association included in its rate filings. The association requested that the Regulatory Commission correct the rates. The Regulatory Commission corrected the rates prospectively, but concluded retrospective application was barred by this court's case law on retroactive ratemaking. The superior court agreed that retrospective application of the adjusted rates was impermissible, and the association appealed. We reaffirm our decision in *Matanuska Electric Association, Inc. v. Chugach Electric Association, Inc.*[1] prohibiting retroactive ratemaking in "second look" cases, but hold that the Regulatory Commission has the authority to implement corrections of some procedural mistakes starting when notice of a mistake is given. We remand to the Regulatory Commission to determine the type of error that occurred in this case and whether the error should be corrected retrospectively.

## II. FACTS AND PROCEEDINGS

The Regulatory Commission of Alaska (RCA) regulates public utilities and pipeline carriers throughout the state.[2] The RCA "certif[ies] qualified providers of public utility and pipeline services and [ ] ensure[s] that they provide safe and adequate services and facilities at just and reasonable rates, terms, and conditions."[3] The RCA is composed of five full-time commissioners serving six-year terms who are appointed by the governor and confirmed by the state legislature.[4] The RCA also has staff that "includes Administrative Law Judges, engineers, financial analysts, telecommunications specialists, tariff analysts, consumer protection officers, paralegals, administrative and support staff."[5]

Generally, when a utility requests a change in rates or services, the RCA provides notice to the public of the proposal and allows a

---

1. 53 P.3d 578 (Alaska 2002).

2. Regulatory Comm'n of Alaska, About RCA, http://rca.alaska.gov/RCAWeb/AboutRCA/Commission.aspx (last visited Feb. 28, 2011).

3. *Id.*

4. *Id.*

5. *Id.*

period of 30 days for comments.[6] Notice may be provided as an advertisement in a local newspaper; sometimes the utilities will provide information in a flyer included with bills sent to consumers.[7] The RCA also engages in a quasi-judicial process for purposes of assessing rate proposals—hearing testimony from experts, witnesses, the parties, and other interested individuals.[8] The RCA can either approve or disapprove of the utility's proposal at the end of this process.[9]

## A. Background On Access Charges In Alaska.

The Alaska Exchange Carriers Association (AECA) is an association of non-competing local telephone companies, known as local exchange carriers. AECA is authorized by the legislature [10] and mandated by the RCA to represent the interests of local exchange carriers when the RCA sets the access charges that long distance telephone companies pay for the use of local telephone systems to complete long distance telephone calls.[11] Prior to the development of the access charge system, individual local exchange carriers negotiated with individual long distance telephone companies to establish payment agreements for the use of local telephone systems for long distance telephone calls.[12] With the development of the access charge system, the RCA began regulating the rates for these services through a complex administrative process that balances the interests of AECA, long distance telephone companies, and rate payers. The resulting access charge system was intended to create

a more uniform, transparent, and efficient system for dividing costs between local and long distance carriers.

The access charge rates payable by long distance carriers for access to the facilities of AECA's pooling local exchange carriers are determined on an annual basis in accordance with applicable RCA regulations. Specifically, 3 Alaska Administrative Code (AAC) 48.440 (2006) provides:

> Access charges shall be assessed for use of local exchange telephone utility facilities by the providers of intrastate interexchange telecommunications services. Those charges must be determined, assessed, and collected, and revenues from those charges must be distributed, in accordance with [the RCA's] rules as set out in the Alaska Intrastate Interexchange Access Charge Manual. . . .

The Manual sets forth a very specific and deliberate annual process pursuant to which access charges of the pooling local exchange carriers are "determined, assessed, and collected," as well as the process by which the revenues from charges are "distributed," as mandated in 3 AAC 48.440.[13] The Manual dictates that this annual process, beginning no later than October 1 and concluding by April 1 of the following year, is governed by a filing schedule which is established by RCA order.[14]

The two primary elements of AECA's pooled access charge rates are the collective revenue requirement and demand for AECA's pooling member local exchange car-

---

6. *Id.*

7. *Id.*

8. *Id.*

9. *Id.*

10. AS 42.05.850 states:
 The commission may require the local exchange carriers to form an association to assist in administering the system of access charges and may require the association to file tariffs and to engage in pooling of exchange access costs and revenue if necessary to achieve the purposes of AS 42.05.800–42.05.890.

11. Pursuant to AS 42.05.830, "the commission shall establish a system of access charges to be paid by long distance carriers to compensate

local exchange carriers for the cost of originating and terminating long distance services."

12. *See generally Alaska Exchange Carriers Ass'n, Inc. v. Regulatory Comm'n of Alaska,* 202 P.3d 458, 459 (Alaska 2009).

13. Manual, § 1("(a) This Manual establishes the rules for access charges for intrastate access services provided by telephone companies on or after April 1, 2004.(b) Charges for such access services shall be computed, assessed, and collected, and revenues from such charges shall be distributed as provided in this Manual.").

14. Manual, §§ 701(b) and 702(a).

riers.[15] The revenue requirement is the total of the various costs incurred by a local exchange carrier during the course of a recent 12–month period to create and maintain the lines of communication between long distance carriers and the consumer. The demand element is the number of minutes during the course of that same 12–month historic period that long distance carriers accessed the facilities of the pooling local exchange carriers.[16] These actual historical revenue and demand elements are adjusted to reflect what are known as "known and measurable changes."[17] Adjustments are made to convert the actual historical revenue requirement and demand figures into projections of what can reasonably be expected in the future.[18]

 Interested parties, such as GCI and AT & T Alascom, are permitted to participate in the annual access charge proceedings and are thereby given the opportunity to test the revenue requirement and demand estimates advanced by AECA and its members. New pooled access charge rates are presented to the RCA by AECA in the form of tariff advice letters, along with underlying work papers and calculations that provide specific information on the derivation of such rates.

## B. The 2007 Access Charge Proceedings.

The 2007 Access Charge proceedings began with AECA, GCI, and AT & T Alascom filing a Joint Petition to Adopt the Access Charge Filing Schedule with the RCA. The Joint Petition was adopted by the RCA on September 26, 2006. Subsequently, AECA, GCI, and AT & T Alascom reached stipulations as to: (1) the revenue requirements for AECA and its members; and (2) the demand for access minutes. These stipulations were accepted by the RCA. The RCA also accepted a stipulation by AECA, GCI, and AT & T Alascom that the 2007 Access Charges would be effective on April 1, 2007.

Following the RCA's acceptance of the revenue requirement and demand stipulations, AECA submitted "Tariff Advice Letter No. 55–999" (TA55–999) to the RCA on May 2, 2007, with copies sent to GCI and AT & T Alascom. Incorporated into TA55–999 was the "2007 Rate Development Workpapers" submitted by AECA, setting forth calculations for the 2007 Access Rate Charges. The workpapers contain a series of spreadsheets apportioning total revenue requirements among members and dividing the overall revenue requirements into the requisite rate elements. The RCA approved TA55–999 on June 21, 2007, with an effective date of April 1, 2007 pursuant to the parties' stipulation. The RCA closed the proceedings on the 2007 Access Charge rates on June 29, 2007.

In mid–August 2007, approximately six weeks after the RCA had closed the 2007 Access Charge proceedings, AECA discovered an error in the spreadsheets it had filed with the RCA as support for its 2007 Access Charges. The error was the result of a failure to link spreadsheet cells correctly. AECA contends that three steps in the rate calculation were affected. Five rates were affected by the error; some were increased and some were decreased. The error resulted in the dial equipment minutes (DEM)

---

15. Manual, § 703(g) ("The pool revenue requirement ... shall be divided by the pool demand units ... to produce the related access charges per demand unit.").

16. Manual, § 702(b). Demand is more formally known as "access minutes" or "access minutes of use." Manual, § 801(a).

17. *See e.g., Golden Valley Elec. Ass'n, Inc.,* RCA Docket U–81–048, Order No. 19. 5 APUC 152, 156 (1982) ("The formula for determining a utility's revenue requirement or total allowed earnings is the sum of the utility's reasonable operating expenses (including taxes) plus fair return on its investment or rate base (net plant-in-service).

Actual operating results for a one-year test period, adjusted for known and measurable changes, provide the analytical framework for determining a utility's revenue requirement. Total revenues may be computed on an average or year-end basis provided there is a proper matching of investment, expense and revenues.... A utility is entitled to recover its reasonable operating expenses.... Operating expenses are determined by normalizing a 'test year,' *i.e.,* adjustments are made for known and measurable changes that have occurred since the end of the test year.").

18. *Id.*

subsidy [19] being improperly incorporated into the calculations. The net result was a set of rates that caused $677,503.42 in underbilling for the year 2007.

On August 20, 2007, AECA submitted a "Supplemental Filing to Tariff Advice Letter No. 55–999" to the RCA. This letter provided revised calculations and requested that the RCA modify certain 2007 rates accordingly. The RCA responded by requiring AECA to submit its request as a new tariff advice letter, rather than as a supplement to TA55–999. The next day, AECA submitted "Tariff Advice Letter No. 57–999" (TA57–999). On October 10, 2007, the RCA issued public notice of TA57–999 setting forth the changes AECA proposed to TA55–999 and inviting public comment. AECA provided a more detailed explanation of the error as well as the impact of the under-billing in response to a request for additional information from the RCA.

GCI responded to the request for public comment with a written argument that retroactive application of the corrected rates should not be permitted under this court's decision in *Matanuska Electric Association, Inc. v. Chugach Electric Association, Inc.*[20] AECA submitted comments arguing to the contrary. On November 2, 2007, the RCA issued an order approving the use of the corrected rates prospectively, but holding open for further investigation the question whether the rates should be applied retrospectively to April 1, 2007. AECA and GCI both filed motions for summary disposition, agreeing that no genuine issue of material fact existed, but disagreeing about whether retrospective application of the new rate was permissible under Alaska law. The RCA granted GCI's motion on May 16, 2008, concluding that:

> We do not find ... that the unintended error contained in TA55–999 is merely ministerial and that it might thereby allow the new rate proposed in TA57–999 to be changed retroactively. We deny retroactive application of TA57–999 to April 1, 2007. To act otherwise would violate the principle of retroactive ratemaking articulated by the Alaska Supreme Court.

AECA's Petition for Reconsideration, which GCI opposed, was denied by the RCA.

AECA appealed the RCA's decision to the superior court. Following full briefing by the parties, oral argument was held on April 8, 2009. The superior court denied AECA's administrative appeal on April 16, 2009, concluding "[a] thorough reading of case law and the Alaska statutes that set forth the procedures to be followed in establishing new, revised tariffs supports the RCA's holdings." The superior court concluded that TA57–999 "may be [applied] prospective[ly] only" because "it is clear that the procedures involved here ... [are] subject to the doctrine of retroactive rate-making."

## III. STANDARD OF REVIEW

When the superior court acts as an intermediate court of appeal, we independently scrutinize directly the merits of the administrative determination.[21] For questions of law where no agency expertise is involved, we apply the "substitution of judgment" test.[22] When a matter involves agen-

---

**19.** *See* Mark P. Trinchero & Holly Rachel Smith, *Federal Preemption of State Universal Service Regulations Under the Telecommunications Act of 1996*, 51 FED. COMM. L.J. 303, 329 n. 154 (1996) ("The DEM weighting subsidy, established prior to the [Telecommunications Act of 1996], is based on the premise that smaller telephone companies realize higher local switching costs per line because smaller companies are unable to realize economies of scale. As a result, the DEM weighting rules allow small companies to recover local switching costs through interstate traffic.... The separations rules allocate local switching equipment costs between the interstate and intrastate jurisdictions based on the jurisdiction's relative number of dial equipment minutes of use (DEM). Local exchange carriers with fewer than 50,000 lines are allowed to allocate an additional amount of local switching costs, determined by weighting the interstate minutes of use, to the interstate jurisdiction. DEM weighting is funded by the entities that pay switched access charges, [long distance carriers] and their customers.").

**20.** 53 P.3d 578 (Alaska 2002).

**21.** *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987) (citing *Amerada Hess Pipeline Corp. v. Alaska Pub. Utils. Comm'n*, 711 P.2d 1170, 1175 (Alaska 1986)).

**22.** *Lakloey, Inc. v. Univ. of Alaska*, 157 P.3d 1041, 1045 (Alaska 2007) (citing *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992)).

cy expertise we apply a "reasonable basis" test, giving deference to the agency's specialized knowledge and expertise.[23]

## IV. DISCUSSION

The first issue in this case is whether the RCA properly relied on the doctrine of retroactive ratemaking when it decided that the corrected 2007 Access Charge could only be applied prospectively following its November 2007 order approving the corrected rate. AECA concedes that retroactive ratemaking is not permitted in Alaska, but argues that correcting the error in its worksheet does not constitute "retroactive ratemaking." Alternatively, AECA argues that even if the doctrine of retroactive ratemaking applies, the corrected rate should nonetheless be implemented: (1) retrospectively to April 1, 2007 because of the parties' prior stipulations; or (2) at least to August 21, 2007 when AECA initially requested the corrected rate. GCI argues that our precedent in *Matanuska Electric Association, Inc. v. Chugach Electric Association, Inc.*[24] directly controls this case and prohibits retroactive application of the corrected 2007 Access Charge. The RCA similarly argues that "[i]n view of this Court's articulation of the policies underlying, and the rationale for, the prohibition against retroactive ratemaking, ... the multiple retroactive rate adjustments sought by AECA must be precluded." The RCA alternatively argues that even if we decide that an exception to the retroactive ratemaking rule applies to this case, our court "should merely authorize—but not compel—[the RCA] to grant the relief sought by AECA," and remand the case back to the RCA to determine how it should exercise its discretion.

### A. We Affirm Our Holding In *Matanuska Electric Association, Inc. v. Chugach Electric Association, Inc.*

In *Matanuska Electric Association, Inc. v. Chugach Electric Association, Inc.*, the parties did not dispute the impermissibility of retroactive ratemaking under Alaska law; they disputed whether this prohibition applied to the facts of their case.[25] Chugach Electric Association (Chugach) sold wholesale electricity to Matanuska Electric Association (MEA).[26] The case dealt with "the use of an estimated generation and transmission system energy loss in Chugach's fuel surcharge filings."[27] In other words, Chugach used a "line loss" factor to adjust its base rate to reflect the amount of energy lost in the process of generating electricity and transmitting it across power lines.[28] The amount of energy lost through generation and transmission varies and cannot always be accurately predicted.[29] To compensate Chugach for this loss, line loss factors were computed in a fuel surcharge.[30] But because the line loss fluctuates, the fuel surcharge was an estimate and it was acknowledged that "the amount collected might fall short or exceed the actual cost."[31]

Starting in "the mid–1980s, Chugach [ ] used a line loss factor of 5.219% in its rate filings for wholesale customers."[32] But in 1997 "Chugach and MEA discovered a discrepancy."[33] The 5.219% loss claimed by Chugach was substantially higher than "the actual line loss experienced by Chugach in 1995, 1996, and 1997."[34]

MEA argued that because Chugach submitted an inaccurate estimate of the line loss factor, MEA was entitled to a refund based on the difference between the inaccurate line

23. *Storrs v. State Medical Bd.*, 664 P.2d 547, 554–55 (Alaska 1983) (citations omitted).

24. 53 P.3d 578.

25. *Id.* at 583–84.

26. *Id.* at 580.

27. *Id.* at 581.

28. *Id.*

29. *Id.*

30. *Id.*

31. *Id.*

32. *Id.* at 582.

33. *Id.*

34. *Id.*

loss factor and the accurate one.[35] Chugach argued that the RCA could only adjust its rates prospectively—any retrospective application would violate the rule against retroactive ratemaking.[36] The RCA agreed with MEA and entered an order requiring Chugach to recalculate fuel surcharges for the years 1995 through 1997 using actual line loss factors and refund the difference between the original and revised surcharge.[37] But the superior court reversed the administrative ruling,[38] and our court affirmed the superior court's decision.[39] Setting out the contours of the general prohibition against retroactive ratemaking, our decision in *Matanuska* explained:

> A fundamental rule of ratemaking is that rates are exclusively prospective in nature. One purpose of having such a rule is a consumer's right to rely on rates set by [the RCA]. Some reliability, of course, is essential to the public utility regulatory system. If commissions could retroactively change rates willy-nilly, and ratepayers' bills and utility revenues were continually subject to large fluctuations, serious questions would arise concerning the legitimacy of the ratemaking process. Thus, the rule is critical for a utility to plan its finances. Other purposes for prohibiting retroactive rates include investor confidence, utility credit rating, and the integrity of service. And retroactivity, even where permissible, is not favored, except upon the clearest mandate.[40]

MEA argued that the fuel surcharges at issue in Chugach's rate were distinguishable from regular RCA-made rates, and therefore were not subject to the prohibition against retroactive ratemaking.[41] In addressing this argument, we considered what type of review the RCA provided for "fuel surcharge filings in Alaska and whether such review is adequate to consider a fuel surcharge a rate, applicable to the prohibition against retroactive ratemaking."[42] We concluded that the fuel surcharge constituted a RCA-made rate subject to the general rule against retroactive ratemaking because: (1) fuel surcharges in Alaska receive a documentary review; and (2) the RCA's review of Chugach's fuel surcharge was substantial enough to constitute a rate.[43] We deemed it relevant that the filings for fuel surcharges were subject to the same statutory notice and review requirements as the utility's base rates.[44] MEA and the RCA characterized the RCA's review of fuel surcharge filings as "purely ministerial," but we disagreed, finding that it was within the RCA's power to question and investigate the validity and accuracy of the line loss factors Chugach submitted, not to simply accept them as presented.[45] And we concluded that requiring Chugach to repay past rates based on the inaccuracy of its line loss factor estimate would violate the rule against retroactive ratemaking:

> The law supports this approach. *The essential principle of the rule against retroactive ratemaking is that when the estimates prove inaccurate and costs are higher or lower than predicted, the previously set rates cannot be changed to correct for the error;* the only step that [the RCA] can take is to prospectively revise rates in an effort to set more appropriate ones. . . . Thus, the time for challenging a fuel adjustment rate is before the rate is approved by the Commission.[46]

The primary rationale articulated in *Matanuska* for prohibiting retroactive ratemaking is that inaccurate estimates are not adequate

---

**35.** *Id.* at 582–83, 587.

**36.** *Id.* at 582–83.

**37.** *Id.* at 582.

**38.** *Id.* at 583.

**39.** *Id.* at 587.

**40.** *Id.* at 583 (internal quotations omitted).

**41.** *Id.* at 584.

**42.** *Id.*

**43.** *Id.* at 584–86.

**44.** *Id.* at 584–85. The statutory requirements we referred to are set out in AS 42.05.411(a) and AS 42.05.421.

**45.** *Id.* at 585.

**46.** *Id.* at 585–86 (internal citations and quotation marks omitted; emphasis added).

justification for imposing retroactively altered rates based on more accurate after-the-fact data about what the rates should have been. The goals of the rule against retroactive ratemaking are to ensure that utilities engage in efficient and effective ratemaking to produce estimates that accurately represent their actual costs, and to protect parties who rely on rates approved by the RCA. The rule creates an incentive for accurate estimates in the ratemaking process; without it, utilities would have less incentive to scrutinize estimates because they could alter a rate if more information became available after the fact.

## B. The Rationale Supporting The Rule Against Retroactive Ratemaking Outlined In *Matanuska Electric Association, Inc. v. Chugach Electric Association, Inc.* Does Not Apply To All Mistakes.

### 1. The error in *Matanuska Electric Association, Inc. v. Chugach Electric Association, Inc.* was an inaccurate projection.

In *Matanuska,* we extensively cited a 1991 law review article [47] examining how various jurisdictions have applied the rule against retroactive ratemaking in different contexts.[48] All parties to this appeal cite at length to this article; the superior court also relied on our previous discussion of the article in reaching its decision. The article, *The Ghost of Regulation Past: Current Applications of the Rule Against Retroactive Ratemaking in Public Utility Proceedings,* forms the foundation of the parties' discussion of retroactive ratemaking and the distinction between "second look" and "procedural mistake" cases.

AECA argues that *Matanuska* dealt with altering a rate after a "second look" at an inaccurate estimate, that this case does not concern a "second look" at a rate derived from an inaccurate estimate, and that this is not a case of retroactive ratemaking. GCI argues that in *Matanuska,* we "rejected the line of cases in other jurisdictions that create a general exception to the rule against retroactive ratemaking for fuel adjustment clauses, and, instead, placed Alaska firmly in the camp of jurisdictions that strictly adhere to the rule prohibiting retroactive ratemaking." The superior court agreed with GCI, viewing our holding in *Matanuska* as "a strict interpretation of the doctrine" prohibiting retroactive ratemaking.

The issue in *Matanuska* was specific: whether the RCA could retroactively replace an inaccurately estimated line loss factor for a more accurate after-the-fact calculation that reflected Chugach's actual experience.[49] The controversy in *Matanuska* is further distinguishable from the facts of this case because Chugach's erroneous line loss factor was not discovered for several years.[50] As explained, our concern in *Matanuska* was the inaccurate prediction of Chugach's future line loss factor, because "the essential principle of the rule against retroactive ratemaking is that when the estimates prove inaccurate and costs are higher or lower than predicted, the previously set rates cannot be changed to correct for the error." [51] Our holding in

---

**47.** Stefan H. Krieger, *The Ghost of Regulation Past: Current Applications of the Rule Against Retroactive Ratemaking in Public Utility Proceedings,* 1991 U. Ill. L.Rev. 983 (1991). Krieger's article is widely cited in other jurisdictions as well. *See, e.g., Sugarmill Woods Civic Ass'n, Inc. v. Fla. Water Servs. Corp.,* 785 So.2d 720, 726 (Fla.Dist.App.2001); *Pub. Advocate v. Pub. Utils. Comm'n,* 718 A.2d 201, 210 (Me.1998) (Saufley, J., dissenting); *S. Union Co. v. Dep't of Pub. Utils.,* 458 Mass. 812, 941 N.E.2d 633, 641 (2011); *Application of Minnegasco,* 565 N.W.2d 706, 712 (Minn.1997); *In re Comm'n Investigation Into 1997 Earnings of U.S. West Commc'ns, Inc.,* 127 N.M. 254, 980 P.2d 37, 43 (1999); *In re Island Hi–Speed Ferry, LLC,* 852 A.2d 524, 534 (R.I.2004) (Flanders, J., dissenting); *Pub. Util. Comm'n of Tex. v. GTE–Southwest, Inc.,* 901 S.W.2d 401, 406 (Tex.1995); *Wis. Power & Light Co. v. Pub. Serv. Comm'n,* 181 Wis.2d 385, 511 N.W.2d 291, 297 (1994) (Abrahamson, J., dissenting); *PacifiCorp v. Pub. Serv. Comm'n of Wyo.,* 103 P.3d 862, 875 (Wyo.2004).

**48.** 53 P.3d at 580 n. 1, 581 n. 9, 583 n. 18.

**49.** *Id.* at 581–82.

**50.** *Id.* at 582. The line loss factor was introduced in the mid–1980's. The estimation error impacted rates in 1995, 1996, and 1997. The error was discovered in 1997.

**51.** *Id.* at 585 (quoting *Detroit Edison Co. v. Mich. Pub. Serv. Comm'n,* 416 Mich. 510, 331 N.W.2d 159, 164 (1982)).

*Matanuska* was consistent with Krieger's position that "the rule [against retroactive ratemaking] requires that when determining each of the terms of the revenue requirement formula, when calculating the amount of revenue to be collected under proposed rates, or when allocating rates between classes or within a class, [the RCA] cannot adjust for past losses or gains to either the utility, consumers, or particular classes of consumers." [52] *Matanuska* does not reflect an absolute bar against the adoption of any corrected rates on a retrospective basis, as GCI argues; the question presented in *Matanuska* was limited to a straightforward application of the doctrine in a case involving an incorrect projection of future costs.

*Matanuska* represents a "second look" case where the prohibition against retroactive ratemaking clearly applies. The facts of AECA's case are different. As Krieger explains, "a rigid interpretation of the rule against retroactive ratemaking would ... prohibit any modification by the commission of a prior rate order that affects past utility gains or losses, [but] courts have allowed such changes in situations [where] the commission is remedying procedural mistakes." [53]

Examples of "procedural" or clerical mistakes include those in *Mike Little Gas Co. v. Public Service Commission*, where a gas company applied for a rate of "$3.5752 for two Mcf's of natural gas" and the agency issued an order incorrectly setting the rate at "$3.5752 per Mcf for the first two Mcf's." [54] This error would have had a significant impact on the revenue collected by the utility—but the court recognized it was essentially a typographical error, and it was an error made by the Commission itself. Under these circumstances, the Commission was permitted to correct the error. [55] The rate correction in *Mike Little* was entirely consistent with the underlying reasons for the rule

against retroactive ratemaking: (1) the court found the parties were not justified in relying on the incorrect order issued just days earlier; [56] (2) permitting the correction of the order did not encourage sloppy or inefficient estimates by the utility; [57] and (3) the correction was not shown to implicate any of the other harms associated with retroactive ratemaking. [58]

Other jurisdictions have similarly recognized a category of "procedural" errors, at least some of which may be retroactively remedied. In *Illinois Power Co. v. Illinois Commerce Commission*, the Illinois Court of Appeals held:

> If a mere mathematical error resulted in a double reduction for the disallowed deferred charges, the mistake should be remedied. If, however, the calculation was designed to account for errors ... on a prospective basis, then what [Illinois Power] perceives as a ministerial error was in fact an informed policy decision and should not be disturbed. [59]

The Indiana court of appeals reached a similar conclusion in its unpublished decision *Indiana Office of Utility Consumer Counselor v. Duke Energy Indiana, Inc.*, holding that where an energy company, "in previously mis-stating its [construction cost] balances ..., failed to comply with FERC accounting guidelines," a subsequent accounting correction did not create "the type of situation that should be controlled by the rule against retroactive ratemaking." [60] The court explained: "We also fail to perceive how permitting Duke to make this accounting correction would negatively affect utility planning, investor confidence, utility credit rating, or integrity of service [i.e., the factors identified by the Indiana court

52. Krieger, *supra* note 47, at 997.

53. *Id.* at 1002.

54. 574 S.W.2d 926, 927 (Ky.App.1978).

55. *Id.* at 928.

56. *Id.* at 927.

57. *Id.* at 927–28.

58. *Id.*

59. 254 Ill.App.3d 293, 193 Ill.Dec. 403, 626 N.E.2d 713, 724 (1994).

60. 896 N.E.2d 936, 2008 WL 4892553 at *4 (Ind.App.2008).

as underlying the purposes of the rule against retroactive ratemaking]." [61]

An example of a mistake that was considered substantive and was not permitted to be corrected occurred in *General Motors Corp. v. Public Service Commission.*[62] There, a plant producing synthetic natural gas closed two months after the Public Service Commission issued a new rate.[63] Michigan's Attorney General, as an intervenor, sought to have the Commission retroactively apply a new rate based on this change in circumstances (the mothballing of the plant).[64] The court concluded that the change in circumstances did not present a justifiable reason to alter the rates retroactively for the two months the plant was operational.[65] This result is consistent with the rule against retroactive ratemaking because the error in *General Motors* was in establishing a rate based on a projection, ultimately proven wrong, that the plant would remain open. *General Motors* represents a "second look" error where a change in anticipated circumstances was used as a justification for altering a rate; only in hindsight did the rate appear to be incorrect. As Krieger explains, "the rule against retroactive ratemaking encourages efficiency because the utility will endeavor to increase profits under the approved rate. If the utility knows that it can recoup past losses retroactiv[ely] or that ratepayers can obtain refunds of excess profits, it will have little or no incentive to operate efficiently." [66]

Other types of mistakes require further examination of the rationale for the rule against retroactive ratemaking to determine whether a particular mistake justifies retrospectively altering a rate. Krieger's article provides an overview of how different courts treat the rule of retroactive ratemaking in different contexts and it examines the purpose behind the doctrine. Krieger proposes the following outcome:

> [C]ommissions and courts should apply a presumption against retroactivity but analyze the particular circumstances of the case to determine if the presumption should apply. They should first consider the rationality and legitimacy of the expectations of the parties in regard to previously approved rates. They should then examine the potential effects of retroactive relief on economic incentives for the utility. If it appears that reliance on the prior rates was not rational or legitimate and that a retroactive remedy would not create substantial efficiency disincentives, courts should allow such relief.[67]

Applying this rule in the context of "procedural mistake" cases, Krieger states that "the proposed method generally would allow retroactive relief." [68]

We do not decide that application of these considerations "would generally" allow for retroactive relief in "procedural mistake" cases; in our view, even "procedural mistake" cases will have to be examined individually and with caution. But we agree with Krieger that at one end of the spectrum "it is difficult to understand how a party could have a rational or legitimate expectation that a court would not rectify clerical [errors] in a commission order." [69] And we agree with AECA that one factor that distinguishes its case from some others is the brief period of time its error went uncorrected. But protecting the reliance interests of consumers and fostering economic efficiency of utilities are primary concerns of the doctrine,[70] and the parties sharply disagree about whether GCI and AT & T Alascom relied on the erroneous 2007 rates to their detriment. As discussed below, this is a question of fact

61. *Id.*

62. 175 Mich.App. 584, 438 N.W.2d 616 (1988).

63. *Id.* at 587, 438 N.W.2d 616.

64. *Id.* at 591, 438 N.W.2d 616.

65. *Id.*

66. Krieger, *supra* note 47, at 1042.

67. *Id.* at 1044–45 (citations omitted).

68. *Id.* at 1045.

69. *Id.*

70. *Matanuska Elec. Ass'n, Inc. v. Chugach Elec. Ass'n, Inc.*, 53 P.3d 578, 583 (Alaska 2002); Krieger, *supra* note 47, at 1038–1043.

best resolved by the RCA using its specialized expertise.

## 2. Recognizing procedural mistakes as distinct from prohibited retroactive ratemaking is consistent with the policies and purposes underlying our decision in *Matanuska Electric Association, Inc. v. Chugach Electric Association, Inc.*

GCI challenges AECA's distinction between "procedural" or clerical mistake cases and "second look" cases, arguing that "human error" was to blame for Chugach's failure to update its line loss factor to reflect actual experience, and that "human error" was also responsible for the failure to link the spreadsheets filed by AECA. AECA argues that GCI misunderstands the rationale underlying the rule against retroactive ratemaking, and that the goals of the rule are not undermined by correcting the rate in this case.

We think AECA has the better argument. As we have explained, the error in this case cannot be equated to a "second look" at an inaccurate prediction of the cost of providing service to utility customers. Further, rectifying the error in this case could return the parties to the position they agreed to when they entered into stipulations for the demand and revenue requirements to determine the 2007 rates. It appears uncontested that the corrected rates would have been adopted as the 2007 rates if AECA's spreadsheets had been properly linked.[71]

The parties do not dispute that because of AECA's spreadsheet error, GCI and its ratepayers will receive a windfall at the expense of AECA and its ratepayers. GCI emphasizes that it was AECA, and not the RCA, that made the procedural mistake, suggesting that AECA must live with the consequences of its own error. But GCI does not address the potential situation where AECA's error cuts in its favor. And during oral argument before our court, GCI declined to answer whether it would advocate for the same bright-line rule if AECA's error led to AECA receiving a windfall rather than GCI.

GCI insists that the issue of overbilling as a result of a calculation mistake "is not before, and need not be addressed by, this Court," but this hypothetical seems to be the other side of the same problem.

## 3. The level of complexity in correcting the error is not a determining factor in whether the mistake is procedural.

While the underlying facts of this case are undisputed, both sides characterize the error and its impact quite differently. AECA characterizes its error as a "simple calculation 'mistake,'" based on the failure to link spreadsheets correctly. But GCI argues that "[t]he rate changes in TA57–999 … required the approval of two new tariff pages and changed 5 different rates," and that "the error at issue occurred in AECA's calculation of the revenue requirement, not in the calculation of the rates." GCI also argues that the RCA's determination that the error was not "merely ministerial" is backed up "by AECA's own description of the error, which explains that it was a computational error buried in the spreadsheets and work papers supporting the requested rates."

From the record available to our court, it is difficult to tell which party's characterization of the error is more accurate. Under AECA's characterization, once the underlying revenue requirement and demand factors are determined (in this case through stipulations), the rest of the ratemaking process is fairly mechanical, following the "noncontroversial rate calculation procedures" set forth by the Manual. GCI and the RCA paint a more complex picture; GCI describes a multi-step process leading from the stipulations of the pooled revenue requirement and demand to the actual access charge rate. The RCA distinguishes between the stipulated pooled revenue requirements and the "subcomponent 'intrastate revenue requirements' that are ultimately used to develop the five specific … intrastate access charge rates which are at issue here."

The approval of the rate change prospectively, without dispute about the material

---

71. After GCI received notice of this error, it examined the corrected worksheet and did not object to the prospective application of the corrected rate AECA proposed.

facts, indicates that the steps that follow the parties' stipulations to the revenue requirement and demand calculations may be procedural. If that is correct, AECA's erroneous spreadsheet may be fairly categorized as a procedural mistake even if the calculations that follow it are complicated. As AECA suggested in its reply brief, no "disputed issues existed after the approval of the revenue requirement," and "no controversies between the parties remained to be determined by [the RCA]." Having reviewed the parties' arguments, it is not clear from the record available to our court that correcting AECA's spreadsheet error would violate the underlying reasons for retroactive ratemaking rule we articulated in *Matanuska Electric Association, Inc. v. Chugach Electric Association, Inc.*[72]

### C. The RCA Has The Authority To Determine The Type Of Mistake That Occurred In The Ratemaking Process And Whether To Retrospectively Apply The Corrected Rate.

At oral argument before our court, the RCA made clear that its decision to deny any retrospective application of the corrected 2007 rates was based on its understanding that it lacked the authority to grant this relief. But it is apparent that there are some cases in which the RCA would be obliged to correct an erroneous rate—such as correcting a typographical error of its own. Because the RCA's expertise makes it uniquely well suited to identify the type of error at issue, the ramifications of correcting it, and the ways in which errors do or do not implicate the considerations we articulated in *Matanuska Electric Association, Inc. v. Chugach Electric Association, Inc.*, we remand this case to the RCA for consideration of AECA's request. On remand, the RCA is empowered to retrospectively apply the corrected 2007 rates if, after considering the underlying rationale for the doctrine against retroactive ratemaking, it determines this is an appropriate case for making such an adjustment.[73]

### D. "Procedural Mistakes" May Only Be Corrected To The Date That Public Notice Of The Mistake Is Provided.

AECA argues that even if the prohibition against retroactive ratemaking is implicated by the facts of this case, RCA should nonetheless have instituted the revised rate prior to its November 2, 2007 order. It argues for an April 1, 2007 effective date based on the parties' stipulation that the 2007 rates would become effective on that date. Alternatively, AECA argues that the corrected rate should have been implemented as of August 21, 2007, when public notice was given of the spreadsheet error.

■ Having considered the parties' arguments, we hold that notice of a proposed rate is presumptively sufficient to overcome the reliance interest concerns raised when correcting a "procedural mistake."[74] The rule that a corrected rate may only be corrected to the date of public notice provides an incentive to utilities to provide notice of errors as soon as possible. Thus, if the RCA finds that correction in this case is appropriate, it may correct the rate starting August 21, 2007—the date AECA gave public notice of the mistake—unless it is shown that other parties detrimentally relied on the approved rate in the interval after notice of the error was made public and before the order approving use of the corrected rate.

## V. CONCLUSION

We VACATE the order of the superior court and REMAND this case to the RCA for further proceedings consistent with this opinion.

STOWERS, Justice, concurring in part and dissenting in part.

WINFREE, Justice, dissenting in part.

---

**72.** 53 P.3d 578.

**73.** *See, e.g., Alaska Pub. Utils. Comm'n v. Municipality of Anchorage*, 902 P.2d 783, 788 (Alaska 1995) (including "utility planning, investor confidence, utility credit rating, and the integrity of service" among the "several reasons for the general rule against retroactive ratemaking").

**74.** *See* Krieger, *supra* note 47, at 1046.

STOWERS, Justice, concurring in part and dissenting in part.

I agree in part and disagree in part with the court's opinion. I begin by noting that the court's opinion, recognizing that the Regulatory Commission of Alaska (RCA) has the authority to correct some procedural mistakes, does not expressly hold that these permissible corrections would constitute retroactive ratemaking. I think a fair reading of the opinion implies that these corrections are retroactive ratemaking, and the court is carving out a narrow exception where it is permissible for the RCA to engage in retroactive rulemaking.

My first disagreement with the court arises from my conclusion that Alaska Exchange Carriers Association's position in this appeal is correct: this is not a case of retroactive ratemaking, but rather a case of a correction of a mathematical or clerical mistake; in other words, a procedural correction to a procedural mistake. I would hold that, on the facts of this case and given the nature of the error and the simple way that it can be corrected, any such correction would be merely a mathematical, or clerical, or procedural correction—not ratemaking.[1] Under this analysis, it is unnecessary to create any

exception to the rule against retroactive ratemaking.

Regardless, whether the correction is retroactive ratemaking or not, I agree with the court that RCA has the authority to correct mathematical, clerical, or procedural mistakes of the kind in this case, for the reasons given by the court's opinion.

My second disagreement with the court goes to the remedy on remand. Given that all parties agree that the underlying assumptions and data (i.e., the numbers that were used to generate the agreed upon rate) are correct, and that but for the procedural mistake made in this case the rate would have been correctly calculated, I would remand this case to the RCA with instructions to make the necessary correction. I see no reason to have RCA further consider any issue in this case; the parties have previously agreed to the correct figures and calculations and RCA has already approved those figures and calculations, both with respect to the original rate and with respect to the rate's prospective application. Under these circumstances, all the court need do is explain that RCA, with its new authority to correct procedural errors, should correct this one.

---

1. *See Bldg. Owners and Managers Ass'n of Metro. Detroit v. Mich. Pub. Serv. Comm'n,* 383 N.W.2d 72, 80–81 (Mich.1986), wherein the court explained:

> plaintiffs contend that the subsequent validation of the 1970 rate order amounted to a retroactive rate increase that is prohibited by law.
> We do not agree. A rate was set and a subsequent hearing supplied the necessary finding of reasonableness after proper notice to the ratepayer. The rate was not changed after the fact....
> *A challenge to a rate based on a procedural flaw does not render its subsequent validation a retroactive rate.*

(Emphasis added) (citation omitted).

Similarly, in *Ill. Power Co. v. Ill. Commerce Comm'n,* 254 Ill.App.3d 293, 193 Ill.Dec. 403, 626 N.E.2d 713, 724 (1994), the court explained:

> *If a mere mathematical error resulted in a double reduction for the disallowed deferred charges, the mistake should be remedied.* If, however, the calculation was designed to account for errors ... on a prospective basis, then what [Illinois Power] perceives as a ministerial error was in fact an informed policy decision and should not be disturbed.

(Emphasis added).

And in *Ind. Office of Util. Consumer Counselor v. Duke Energy Ind., Inc.,* 896 N.E.2d 936, 2008 WL 4892553 at \*4–5 (Ind.App. Nov. 14, 2008), the court said:

> We agree with Duke that this is not the type of situation that should be controlled by the rule against retroactive ratemaking. What occurred in this case is that Duke, in previously mis-stating its [construction cost] balances ..., failed to comply with FERC accounting guidelines. This resulted in an erroneous stating of the total project balances of Duke's under-construction [property]. It would appear that if Duke had not made this accounting correction ... the capital balances for those projects would continue to be erroneous in the future. Duke chose instead to correctly state the total [construction costs] that should have been calculated according to FERC guidelines....
> We also fail to perceive how permitting Duke to make this accounting correction would negatively affect utility planning, investor confidence, utility credit rating, or integrity of service [the factors identified by Indiana courts underlying the purposes of the rule against retroactive ratemaking].

Finally, I disagree with the court's resolution of the effective date of the correction: the date that public notice is given of the error. The underlying rationale of this effective date is to create an incentive in the party who will benefit from the correction to promptly identify and seek to correct mathematical, clerical, or procedural errors. While this might be a laudatory policy in some cases, I see no justification for such a rule in this case. As is well explained in the majority opinion, all parties and the RCA agreed on the assumptions and data supporting the original rate—that is to say, there is no dispute that the inputs and numbers used to generate the original rate are correct. A procedural error was made that made the calculation of the rate incorrect. All that is necessary to correct this procedural error is to use the agreed-upon numbers in the correct calculation. In the absence of any showing that any party acted in a way to improperly or unfairly benefit from the failure to discover the calculation error, I see no good reason not to simply correct the calculation *nunc pro tunc* to the effective date of the original rate. I would require the RCA to do so in this case.

Hypothetically, if there were some evidence that a party had acted improperly or unfairly to obtain a benefit from a procedural calculation error, then I would agree with Justice Winfree's dissent and hold that the RCA should use its discretion to determine an appropriate corrective date. One of the factors the RCA could consider is the majority's policy rationale for using the date of first public notice of the error—to create an incentive to promptly identify and correct procedural errors.

In all other respects, I concur with the court's opinion.

WINFREE, Justice, dissenting in part.

I agree with the court in all respects but one. I would leave it to the discretion of the Regulatory Commission of Alaska (the RCA), after it concludes that a rate-making "procedural mistake" was made when setting a tariff, to determine an appropriate corrective date in light of all relevant facts and circumstances of the particular case. I see insufficient justification for establishing the mistake's date of public notice as the earliest possible corrective date. And there is no reason to foreclose the possibility that in a particular case the original rate approval date, or some date after the original rate approval date but before the mistake's date of public notice, would be the appropriate corrective date. The court rightfully relies on the RCA's expertise to make the initial determination of whether a procedural mistake was made; I would also rely on the RCA's expertise to determine an appropriate corrective date. I therefore respectfully dissent on this narrow issue.